******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

## TAJAH S. MCCLAIN *v.* COMMISSIONER OF CORRECTION
### (AC 40541)

Prescott, Bright and Bishop, Js.

*Syllabus*

The petitioner, who had been convicted of, inter alia, murder with a firearm in connection with the shooting death of the victim, sought a writ of habeas corpus, claiming, inter alia, that his trial counsel had provided ineffective assistance and that he was actually innocent. The habeas court rendered judgment denying the habeas petition and, thereafter, denied the petition for certification to appeal, and the petitioner appealed to this court. *Held*:

1. The habeas court did not abuse its discretion in denying the petition for certification to appeal with respect to the petitioner's claim that his trial counsel provided ineffective assistance:

    a. The habeas court properly determined that the petitioner failed to show that he was prejudiced by his trial counsel's failure to present a third-party culpability defense and to produce evidence that another individual, V, shot the victim; the petitioner failed to demonstrate that there was a reasonable probability that, but for counsel's failure to present a third-party culpability defense, the outcome of his trial would have been different, as the descriptions of the shooter more closely matched the physical features of the petitioner than those of V, testimony at the habeas trial connecting V to the shooting was unreliable, unclear, and, at most, raised a bare suspicion that V may have been involved in a shooting, and even if a social media post in which V purportedly referred to the shooting had been found and properly authenticated, it failed to constitute an admission by V sufficient to raise a reasonable doubt as to the petitioner's culpability.

    b. The petitioner failed to show that he was prejudiced by his trial counsel's failure to present evidence of an initial segment of a video recorded police interview of a witness for the state, which the petitioner alleged had been redacted; the petitioner failed to present any evidence, apart from his own allegation that he had viewed an original video, that an initial portion of the video existed or that if it did exist it was not shown to the jury, and trial counsel's cross-examination of the witness and the detective who recorded the interview allowed the jury to weigh their credibility regarding the nature of the video without the presentation of the purported initial segment of the video.

2. The habeas court properly denied the petition for certification to appeal with respect to the petitioner's claim of actual innocence, the petitioner having failed to establish by clear and convincing evidence that he was innocent of the murder for which he was convicted and that no reasonable fact finder would find him guilty of the crime; although the testimony of B presented by the petitioner at the habeas trial was newly discovered evidence, B's testimony was insufficient to prove by clear and convincing evidence that the petitioner was actually innocent in light of the overwhelming evidence of the petitioner's identification as the shooter at the criminal trial and the habeas court's conclusion, after viewing both the petitioner and V, that the petitioner more closely resembled the description of the shooter, and even if the testimony of two other witnesses presented by the petitioner at the habeas trial constituted newly discovered evidence, such testimony was unreliable and did not constitute clear and convincing evidence of the petitioner's actual innocence.

Argued November 27, 2018–officially released February 26, 2019

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Sferrazza, J.*; judgment

denying the petition; thereafter, the court denied the petition for certification to appeal, and the petitioner appealed to this court. *Appeal dismissed.*

*Jennifer B. Smith*, assigned counsel, with whom, on the brief, was *Samuel A. Greenberg*, assigned counsel, for the appellant (petitioner).

*Rocco A. Chiarenza*, assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, *C. Robert Satti, Jr.*, supervisory assistant state's attorney, and *Emily Dewey Trudeau*, assistant state's attorney, for the appellee (respondent).

*Opinion*

BISHOP, J. The petitioner, Tajah S. McClain, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the habeas court abused its discretion in denying his petition for certification to appeal and improperly rejected (1) his claim that his trial counsel rendered ineffective assistance, and (2) his claim of actual innocence. We conclude that the court did not abuse its discretion in denying the petition for certification to appeal and, accordingly, dismiss the petitioner's appeal.

The following facts and procedural history are relevant to our resolution of this appeal. After a jury trial, the petitioner was convicted of murder with a firearm in violation of General Statutes §§ 53a-54a (a) and 53-202k, assault in the first degree with a firearm in violation of General Statutes §§ 53a-59 (a) (5) and 53-202k, and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). The petitioner received a total effective sentence of sixty-five years incarceration. This court's opinion in the petitioner's direct appeal; see *State* v. *McClain*, 154 Conn. App. 281, 283–84, 105 A.3d 924 (2014), aff'd, 324 Conn. 802, 155 A.3d 209 (2017); sets forth the following facts: "On July 17, 2010, a group of more than ten people were drinking alcohol in the area known as 'the X,' located behind the Greene Homes Housing Complex in Bridgeport [Greene Homes]. Shortly before 5:22 a.m., the victim, Eldwin Barrios, was sitting on a crate when all of a sudden the [petitioner] and at least two other men jumped on him, and started punching and kicking him. The victim kept asking them why they were hitting him, but no one answered. The [petitioner] then was passed a chrome or silver handgun and he fired one shot, intended for the victim. The bullet, however, struck one of the other men in the back of the leg. The man who had just been shot yelled, 'you shot me, you shot me, why you shot me,' to which the [petitioner] replied, 'my bad.' As this was happening, the victim got up and tried to run away, but the [petitioner] fired several shots at him. Three of the [petitioner's] shots hit the victim—one in the leg, one in the arm, and one in the torso—at which point, the victim fell to the ground and died.

"The [petitioner] was arrested three days after the murder. Following a jury trial, the [petitioner] was convicted and sentenced to a total effective sentence of sixty-five years incarceration." (Footnote omitted.) This court affirmed the petitioner's conviction on direct appeal. Id., 283.[1] Thereafter, our Supreme Court affirmed this court's judgment. *State* v. *McClain*, 324 Conn. 802, 805, 155 A.3d 209 (2017).

On September 3, 2013, the petitioner, in a self-repre-

sented capacity, filed a petition for a writ of habeas corpus. On April 1, 2016, the petitioner, represented by counsel, filed the operative amended petition. In the amended petition, the petitioner alleged that (1) his constitutional right to the effective assistance of trial counsel was violated, (2) his right to due process was violated by the state's failure to disclose or otherwise correct false testimony, pursuant to *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and (3) he was actually innocent. By memorandum of decision issued on May 11, 2017, the habeas court denied the amended petition, concluding that the petitioner did not meet his burden of proving a *Brady* violation, did not prove that he was prejudiced by his trial counsel's performance, and did not prove his actual innocence. The court thereafter denied the petition for certification to appeal from its decision. This appeal followed. Additional facts will be set forth as necessary.

We begin by setting forth the applicable standard of review. "Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, he must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . To prove an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . . Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on the merits. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling . . . [and] [r]eversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *Peeler* v. *Commissioner of Correction*, 161 Conn. App. 434, 442–43, 127 A.3d 1096 (2015).

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous." (Internal quotation marks omitted.) *Mercado* v. *Commissioner of Correction*, 183 Conn. App. 556, 561, 193 A.3d 671, cert. denied, 330 Conn. 918, 193 A.3d 1211 (2018).

I

The petitioner first claims that the habeas court abused its discretion by denying his certification to appeal from its decision regarding the petitioner's claim of ineffective assistance of trial counsel. Specifically, the petitioner claims that his trial counsel rendered ineffective assistance by failing to present (1) a third-party culpability defense and (2) evidence of an initial segment of a video recorded police interview of a state's witness that the petitioner alleges exists. In response, the respondent, the Commissioner of Correction, argues, in relevant part, that the habeas court properly denied the petition for a writ of habeas corpus because the petitioner failed to establish that he was prejudiced by an alleged deficiency in his trial counsel's performance. We agree with the respondent.

"The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. . . . Accordingly, [t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Antwon W.* v. *Commissioner of Correction*, 172 Conn. App. 843, 849, 163 A.3d 1223, cert. denied, 326 Conn. 909, 164 A.3d 680 (2017).

"The petitioner's right to the effective assistance of counsel is assured by the sixth and fourteenth amendments to the federal constitution, and by article first, § 8, of the constitution of Connecticut. In *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction. . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong. Accordingly, a court need not determine the deficiency of counsel's performance if consideration of the prejudice prong will be dispositive of the ineffectiveness claim. . . .

"With respect to the prejudice component of the *Strickland* test, the petitioner must demonstrate that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable.

. . . It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings. . . . Rather, [t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . When a [petitioner] challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." (Internal quotation marks omitted.) *Weinberg* v. *Commissioner of Correction*, 112 Conn. App. 100, 106–107, 962 A.2d 155, cert. denied, 291 Conn. 904, 967 A.2d 1221 (2009).

Because the habeas court in the present case determined that the petitioner had not proven that he was prejudiced by the performance of his trial counsel without reaching the deficiency prong, "our focus on review is whether the court correctly determined the absence of prejudice." (Internal quotation marks omitted.) *Mercado* v. *Commissioner of Correction*, supra, 183 Conn. App. 565; see also *Weinberg* v. *Commissioner of Correction*, supra, 112 Conn. App. 108.

A

We first address the petitioner's argument that he was prejudiced by his trial counsel's failure to present a third-party culpability defense. Specifically, the petitioner argues that his trial counsel's failure to produce evidence that Carlos Vidal shot the victim constituted ineffective assistance of counsel.

"It is well established that a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which the defendant has been charged. . . . The defendant must, however, present evidence that directly connects a third party to the crime. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused. . . .

"The admissibility of evidence of third party culpability is governed by the rules relating to relevancy. . . . Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . Accordingly, in explaining the requirement that the proffered evidence establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party, [our Supreme Court has] stated: Such evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of third party culpability [introduced by a defendant] in an attempt to divert

from himself the evidence of guilt. . . . In other words, evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the [fact finder's] determination." (Citations omitted; internal quotation marks omitted.) *State* v. *Arroyo*, 284 Conn. 597, 609–610, 935 A.2d 975 (2007); see also *Johnson* v. *Commissioner of Correction*, 330 Conn. 520, 564,     A.3d     (2019).

The following additional facts are relevant to this claim. During the habeas trial, Donald J. Cretella, Jr., the petitioner's trial counsel, testified that he recalled seeing a police investigative report about the shooting that described an individual speaking with the police and referencing a man named Carlos Vidal. The habeas court subsequently admitted that report as an exhibit for the purpose of showing what may have been available to Cretella at the time of trial. The petitioner's habeas counsel then asked Cretella to read the following portion of the report that was relevant to his testimony: "Jesenia Rhodes called me then came in to talk. She stated Fro's real name is Charlie or Carlos Vidal. He lives on Catherine [Street], he pulled a gun on a girl, she has a restraining order against him, [and] he lives at his aunt's house at 104 Catherine [Street] which is across the street from his girlfriend's house . . . . His mother is [Eleanor] and she lives at 59 Edwin. Jesenia on [July 19, 2010] went on Fro's MySpace account[2] . . . and found a picture of a tombstone that stated 'this is where niggas go when they fuck with me 1986.' This concern[ed] Jesenia because [the victim's] birth year is 1986. Jesenia took a picture of the tombstone before Fro removed it from the account. Jesenia stated someone . . . saw Vidal at Wentfield Park getting out of a rental car with a gun. . . . Before she left I showed her a picture of . . . Vidal [date of birth March 23, 1986,] and she stated that was Fro." (Footnote added.)

Cretella did not recall having a conversation with the petitioner about the report. He also did not investigate the information it contained because his strategy was to present an alibi defense, and, at the time, he believed that the third-party culpability defense was weak. Sergeant John Losak, the Bridgeport police officer who authored the report, testified at the habeas trial that Rhodes had provided him with information regarding the MySpace post but indicated that there was nothing in the post that was exculpatory for the petitioner. Losak further recalled that the information compiled over the course of the investigation did not suggest that there was more than one suspect at the scene of the shooting.

The petitioner's habeas counsel also presented the testimonies of Silas Cox, a purported eyewitness to the shooting, Madeline Griffin, Vidal's aunt, and Shemayah Ben-Israel, an inmate who had shared a holding cell with Vidal in 2014. Cox testified that he was present at a section of the Greene Homes commonly referred to as the "X" in 2010 when the shooting occurred, and that he saw "a Spanish looking guy with a gun shoot and then run away." Cox described the shooter as having white skin and braided hair, not a shaved head as the petitioner had at the time of the shooting. During cross-examination, Cox described his extensive criminal record and acknowledged he had been in jail from February to November, 2010, which period encompasses the July, 2010 date of the shooting. Cox later backtracked from this acknowledgment and stated that he did not recall the exact dates that he had been incarcerated in 2010 because he had "an extensive history of coming back and forth to jail . . . ."

Griffin testified that the victim had robbed her, and that when she told Vidal that the victim had robbed her, he began waving a silver gun around. Griffin stated that this encounter happened before a 2010 car accident in which she had been involved. Griffin further testified that her sister, Eleanor, who is also Vidal's mother, had told her that someone named "Boo" had called Eleanor's house asking for Vidal to meet him in the Greene Homes with the victim, and that "it had to do with a gun." Griffin also stated that Eleanor had asked her if Vidal could stay at her house because he had been shot. Griffin's statements regarding what Eleanor had said to her were admitted at the habeas trial, over hearsay objections, for the purpose of showing what information may have been available to Cretella at the time of the criminal trial. Griffin provided more information about her 2010 accident during cross-examination, stating that she had been involved in a car accident in June, 2010, and that, as a consequence, she had developed memory problems. She also stated that she had been diagnosed with mental health issues, including schizophrenia, for which she takes medication.

Ben-Israel testified that while he was in a holding cell in MacDougall-Walker Correctional Institution with Vidal in 2014, they had a conversation during which Vidal expressed his concern that "a warrant was going to pop up for his arrest . . . for that incident that happened in the [Greene Homes]." Ben-Israel also testified that Vidal had been talking about the petitioner, and that Vidal had told him that "he was supposed to turn himself in, but . . . he wasn't going to turn himself in for nobody. And that is pretty much what he said. He said fuck—he said fuck [the petitioner], basically." Ben-Israel further stated that he had been familiar with the case because he had seen a post that Vidal had made on Facebook in which he bragged "about what was

done in the [Greene Homes]."[3] During cross-examination, Ben-Israel acknowledged that he was serving a twelve year sentence for robbery and that he had a previous criminal record under a different name. He also acknowledged that the Facebook post by Vidal that he allegedly saw did not indicate that Vidal had killed the victim.

The petitioner also testified at the habeas trial. He stated that the only discussion he had with Cretella about Vidal was regarding Rhodes' reference to Vidal in Losak's report. The petitioner recalled that when he asked Cretella about sequestering Rhodes, Cretella cut him off and told him not to worry about her.

The habeas court explicitly addressed the MySpace post and Ben-Israel's testimony in rejecting the petitioner's claim that Cretella failed to investigate or present a third-party culpability defense. The court determined that it was unclear whether Cretella successfully could have authenticated the MySpace post as having been authored by Vidal. The court concluded that, even if the post had been admitted into evidence, it failed "to comprise a clear admission by Vidal that *he*, and not the petitioner, shot the victim"; (emphasis in original); and noted that "it was the petitioner, and not Vidal, whose appearance more closely resembled the shooter's description [given] by most witnesses."

After reviewing the record, we agree with the habeas court's conclusion that, despite the evidence presented, the petitioner failed to demonstrate that there was a reasonable probability that, but for the trial counsel's failure to present a third-party culpability defense, the outcome of his trial would have been different. We agree that even if a third-party culpability defense had been asserted at the petitioner's trial, the purported MySpace post, assuming that it was found and properly authenticated, would have failed to constitute an admission by Vidal sufficient to raise a reasonable doubt of the petitioner's culpability.[4] Sergeant Losak confirmed that he had been made aware of the post, but testified that the investigation of the shooting did not corroborate the information that the post allegedly contained. Moreover, we agree with the court's determination that, because Ben-Israel's testimony concerned a 2014 conversation he had with Vidal "that first came to light about one month before the habeas trial in 2017 . . . Cretella could hardly be faulted for not premising a third-party [culpability] defense on an event which had not yet occurred at the time of the petitioner's criminal trial in 2012."

Additionally, although the court did not specifically discuss the testimony of Cox and Griffin, the court reasonably could have concluded that their testimony did not help the petitioner because it was unclear whether Cox was in prison at the time of the shooting, and because Griffin's memory and mental health issues

raise questions as to the reliability of her testimony. Additionally, the testimony of Cox and Griffin did not directly connect Vidal to the shooting in the present case but, rather, at the most, raised a bare suspicion that he may have been involved in a shooting. See *State* v. *Arroyo*, supra, 284 Conn. 609–610. Finally, as we will discuss further in part II of this opinion, the court found that the evidence at both the criminal and habeas trials provided descriptions of the shooter that more closely matched the physical features of the petitioner than those of Vidal.

Accordingly, the habeas court correctly determined that the petitioner was not prejudiced by Cretella's alleged failure to investigate and present a third-party culpability defense.

B

The petitioner next argues that he was prejudiced by his trial counsel's failure to present evidence of an initial segment of a video recorded police interview of Eduardo Martorony, a witness for the state. The petitioner alleges that an initial portion of the video in which Detective Harold Dimbo intentionally left Martorony alone in the interview room had been redacted. We are not persuaded.

The following additional facts are relevant to this claim. Cretalla testified during the habeas trial that he recalled that, during the petitioner's criminal trial, the police video of Martorony was played to corroborate Martorony's trial testimony. During Cretella's testimony before the habeas court, the video was played to show what information had been available to Cretella. The video began by showing Martorony sitting alone in an interview room looking through police materials. Cretella recalled this initial portion of the video but did not recall whether that initial portion was played for the jury at the criminal trial or whether redactions were made to the first part of the video. Cretella did recall that redactions were made to the latter part of the video and that there was a portion of the video showing Martorony sitting alone in the room for a longer period of time than shown in the recording entered into evidence. He testified, however, that this portion may have occurred later in the interview.

Cretella additionally testified that he thought Martorony's review of the police material during the video could have suggested that he saw information that would have helped him testify about something he actually may not have witnessed. Cretella stated that he cross-examined Martorony regarding the material left in the interview room and that, although he also cross-examined Dimbo about Martorony's interview, he did not recall whether he specifically asked Dimbo about the material left in the room because he did not want to walk into a "potential trap" by asking questions with

potential answers he did not know. Finally, Cretella testified that, in his experience as an attorney, having viewed "hundreds" of police interviews, it is not uncommon for the videos of such interviews to start before the interviewer has entered the room.

Dimbo, who interviewed Martorony during the video, testified that he had met with Martorony before the interview to discuss the case. Dimbo stated that, at this initial meeting, Martorony had provided him with information about the shooting on his own accord. Specifically, Dimbo recalled that Martorony told him that he had witnessed a shooting and provided him with the nicknames of those involved. Dimbo then stated that, after hearing those nicknames, he suspected that the petitioner was the shooter. Dimbo also testified that the material Martorony was seen examining in the video contained only a photograph of the victim, Dimbo's notes from his previous discussion with Martorony, and a photo array. He stated, as well, that apart from the photo array, everything included in the material was information that had been provided directly to him by Martorony. Dimbo further testified that Martorony was left alone in the interview room before the recording began because he needed to leave the room to turn on the video recorder.

The petitioner testified that he had viewed an original video in which Dimbo had left Martorony alone in the interview room because he said he had forgotten something, and the petitioner contended that during his criminal trial, he wanted Cretella to question Dimbo about why he subsequently did not return to the room with anything.

In assessing the petitioner's claim that Cretella failed to present the alleged initial segment of the video recorded police interview, the habeas court determined that the allegation that the video had been redacted was "simply unproven speculation." The court concluded that no credible evidence supported the petitioner's suggestion that the recording began earlier than shown to the jury simply because it abruptly started with Martorony reviewing police material.

On the basis of our review of the record, we conclude that the habeas court reasonably determined that the petitioner offered insufficient evidence to support his allegation that an initial segment of the video existed or that, even if it existed, it was not shown to the jury. No evidence of an initial portion of the video was presented at the habeas trial apart from the petitioner's allegation that he had viewed an "original video." Moreover, the court found that Cretella's cross-examination of both Martorony and Detective Dimbo at the petitioner's criminal trial "decidedly put before the jury the possibility that Martorony previewed police documents, photographs, and/or notes and simply repeated information that he believed the police wanted to hear."

Accordingly, we agree with the habeas court's assessment that because the jury was able to weigh Martorony and Dimbo's credibility regarding the nature of the video without the presentation of any purported initial segment of the video, no prejudice resulted from Cretella's alleged failure to present additional evidence regarding the nature of the video.

The record demonstrates that, even if Cretella had provided deficient performance regarding the third-party culpability defense or the purported missing portion of the video, the petitioner's ineffective assistance claims do not involve issues that are debatable among jurists of reason with respect to the prejudice prong of the *Strickland* test. We conclude, therefore, that the habeas court did not abuse its discretion in denying the petition for certification to appeal from that court's determination that the petitioner failed to prove that he was prejudiced by the ineffective assistance of counsel at his criminal trial.

II

The petitioner also claims that the court abused its discretion in denying his petition for certification to appeal with respect to his claim of actual innocence. We are not persuaded.

We begin by setting forth the relevant legal principles that govern our analysis. "[T]he proper standard for evaluating a freestanding claim of actual innocence, like that of the petitioner, is twofold. First, the petitioner must establish by clear and convincing evidence that, taking into account all of the evidence—both the evidence adduced at the original criminal trial and the evidence adduced at the habeas corpus trial—he is actually innocent of the crime of which he stands convicted. Second, the petitioner must also establish that, after considering all of that evidence and the inferences drawn therefrom as the habeas court did, no reasonable fact finder would find the petitioner guilty of the crime. . . .

"Actual innocence is not demonstrated merely by showing that there was insufficient evidence to prove guilt beyond a reasonable doubt. . . . Rather, actual innocence is demonstrated by affirmative proof that the petitioner did not commit the crime. . . . Affirmative proof of actual innocence is that which might tend to establish that the petitioner could not have committed the crime even though it is unknown who committed the crime, that a third party committed the crime or that no crime actually occurred." (Citation omitted; internal quotation marks omitted.) *Carmon* v. *Commissioner of Correction*, 178 Conn. App. 356, 371, 175 A.3d 60 (2017), cert. denied, 328 Conn. 913, 180 A.3d 961 (2018).

This court has held that "[a] claim of actual innocence must be based on newly discovered evidence. . . . This evidentiary burden is satisfied if a petitioner can

demonstrate, by a preponderance of the evidence, that the proffered evidence could not have been discovered prior to the petitioner's criminal trial by the exercise of due diligence." (Internal quotation marks omitted.) *Ampero* v. *Commissioner of Correction*, 171 Conn. App. 670, 687, 157 A.3d 1192, cert. denied, 327 Conn. 953, 171 A.3d 453 (2017).

The following additional facts are relevant to this claim. During the habeas trial, the petitioner described Vidal as a light-skinned African American, approximately five feet, seven to eight inches tall, and with cornbraids. The petitioner additionally testified that he himself, as opposed to Vidal, never had cornbraids. Vidal also appeared with his counsel during the habeas trial through a video conference and, through his counsel, invoked his right against self-incrimination. When the petitioner's counsel indicated his desire to put Vidal's skin color, hairstyle, and other physical characteristics into the record, the court responded: "Well I can—certainly I can see Mr. Vidal presently, so I can take—my observations are certainly evidence in the case of how he appears. And with that, I don't think you can ask him how his hair was, etc." The court then asked Vidal if he would be willing to answer questions about his height and weight, and although his counsel did not agree to permit him to do so, Vidal did stand up and turn to the side when the court requested that he do so.

In its memorandum of decision, the habeas court first indicated that "[t]he newly discovered evidence proffered by the petitioner" was the testimony of Ben-Israel. The court then found "that the petitioner . . . failed to satisfy his burden of proving, by clear and convincing evidence, affirmatively that [he] did not murder the victim." The court determined that "[a] combination of credible, newly discovered evidence with that previously produced at the petitioner's criminal trial show[ed] that the more accurate and persuasive description of the shooter more closely matched the physical features of the petitioner than those of Vidal." The court stated that it had "viewed Vidal's complexion and other physical characteristics personally." The court also noted that, during the criminal trial, it was established that three persons who knew the petitioner on the day of the shooting identified him as the gunman: (1) Kyle Mason, the other individual who was shot and who provided a recorded statement to police on the day of the incident; (2) Henry Brandon, who saw the petitioner receive a silver pistol from one of his companions and fire the shot that struck Mason; and (3) Martorony, who was speaking with the victim just as the assailants approached to attack and "identified the petitioner as the person who employed a chrome-colored, semi-automatic pistol to shoot the victim." The court concluded that, given the inculpatory evidence against the petitioner, "vague boasts [allegedly] by Vidal of

some nonspecific involvement in the victim's demise falls far short of clear and convincing evidence of the petitioner's innocence."

On appeal, the petitioner argues that (1) Ben-Israel's testimony was newly discovered evidence that could not have been discovered prior to, or during, the petitioner's criminal trial despite the exercise of due diligence, and (2) the testimony of Cox and Griffin also could be considered newly discovered evidence provided that this court determines that the exercise of due diligence would not have unearthed their testimony. The respondent argues that the petitioner's claim should "be rejected because the habeas court acted well within its role as fact finder in concluding that the proffered evidence was insufficient to meet the 'extraordinarily high' burden of proving the petitioner's actual innocence by clear and convincing evidence."

Because it is clear that Ben-Israel's testimony, which came to light one month before the 2017 habeas trial, could not have been discovered prior to the petitioner's 2012 criminal trial through due diligence, we agree with the habeas court that the testimony constitutes newly discovered evidence. We also agree with the habeas court that such testimony fails to establish clearly and convincingly that the petitioner is actually innocent.

In his testimony during the habeas trial, Ben-Israel stated that Vidal told him about the shooting in the Greene Homes, but also stated that he knew about the shooting apart from his conversation with Vidal. Moreover, Ben-Israel repeatedly stated that the social media post by Vidal that he allegedly saw was on Facebook, not MySpace, and that the post did not indicate that Vidal, and not the petitioner, had killed the victim. Ben-Israel's testimony was not only contradictory to the inculpatory evidence presented against the petitioner, but it also failed to unequivocally undermine such evidence. See *Gould* v. *Commissioner of Correction*, 301 Conn. 544, 560, 22 A.3d 1196 (2011) ("[T]he clear and convincing evidence standard should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory. . . . We equated the clear and convincing burden with an extraordinarily high and truly persuasive [demonstration] of actual innocence . . . ." [Citation omitted; internal quotation marks omitted.]). The habeas court considered the overwhelming evidence of the petitioner's identification as the shooter at the criminal trial with its own viewing of the petitioner and Vidal during the habeas trial, and reasonably concluded that the petitioner, not Vidal, more closely resembled the shooter identified by eyewitnesses. As such, we conclude that, in light of the evidence presented at the habeas trial, Ben-Israel's testimony did not support the petitioner's actual innocence claim.

We next turn to the petitioner's argument, which was

not raised during the habeas trial, that the testimony of Cox and Griffin could be newly discovered evidence.[5] In his brief before this court, the petitioner merely restates the relevant portions of Cox and Griffin's testimony without offering an argument or legal authority as to how such testimony could be considered newly discovered.

Even assuming, arguendo, that the testimony of Cox and Griffin could be considered newly discovered, we conclude that such testimony, when weighed against the other evidence presented against the petitioner at the habeas trial, did not constitute affirmative proof of the petitioner's innocence. "To disturb a long settled and properly obtained judgment of conviction, and thus put the state to the task of reproving its case many years later, the petitioners must affirmatively demonstrate that they are *in fact* innocent." (Emphasis in original.) *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 567. As previously discussed in part I A of this opinion, the testimony of Cox and Griffin was unreliable and did not constitute clear and convincing evidence of the petitioner's actual innocence. *Carmon* v. *Commissioner of Correction*, supra, 178 Conn. App. 371 ("the petitioner must establish by clear and convincing evidence that, taking into account all of the evidence . . . he is actually innocent of the crime of which he stands convicted" [internal quotation marks omitted]); see also *Turner* v. *Commonwealth*, 56 Va. App. 391, 411, 694 S.E.2d 251 (2010) ("the petitioner has not met his burden . . . because . . . relief [on a petition for a writ of actual innocence is available] only to those individuals who can establish that they did not, as a matter of fact, commit the crime for which they were convicted and not to those who merely produce evidence contrary to the evidence presented at their criminal trial" [internal quotation marks omitted]), aff'd, 282 Va. 227, 717 S.E.2d 111 (2011). On the basis of our own review, we conclude that the habeas court properly found that the petitioner had not established by clear and convincing evidence that he is innocent of the murder for which he was convicted, and the petitioner failed to establish that no reasonable fact finder would find him guilty of the crime.

On the basis of the foregoing, we conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal. We are not persuaded that the issues, as presented by the petitioner, are debatable among jurists of reason, that they reasonably could be resolved differently, or that they raise questions deserving further appellate scrutiny.

The appeal is dismissed.

In this opinion the other judges concurred.

[1] In his direct appeal, the petitioner claimed "that the trial court (1) improperly limited his cross-examination of an eyewitness, and (2) committed plain error by not instructing the jury on the doctrine of consciousness of guilt." *State* v. *McClain*, supra, 154 Conn. App. 283.

[2] "MySpace is a social networking website where members can create profiles and interact with other members. Anyone with Internet access can go onto the MySpace website and view content which is open to the general public such as a music area, video section, and members' profiles which are not set as private. However, to create a profile, upload and display photographs, communicate with persons on the site, write blogs, and/or utilize other services or applications on the MySpace website, one must be a member. Anyone can become a member of MySpace at no charge so long as they meet a minimum age requirement and register. . . . To establish a profile, a user needs only a valid email account. . . . Generally, a user creates a profile by filling out a series of virtual forms eliciting a broad range of personal data, culminating in a multimedia collage that serves as one's digital face in cyberspace." (Citation omitted; internal quotation marks omitted.) *State* v. *Devalda*, 306 Conn. 494, 511 n.19, 50 A.3d 882 (2012).

[3] "Facebook is a social networking website that allows private individuals to upload photographs and enter personal information and commentary on a password protected profile." (Internal quotation marks omitted.) *State* v. *Kukucka*, 181 Conn. App. 329, 334 n.3, 186 A.3d 1171, cert. denied, 329 Conn. 905, 184 A.3d 1216 (2018).

[4] For a third-party culpability defense to succeed, a defendant need only present evidence that creates a reasonable doubt as to whether the defendant committed the offense. See *State* v. *Arroyo*, supra, 284 Conn. 609–610 ("evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense").

In the present case, although the habeas court may have overstated the quality of evidence adequate to sustain a third-party culpability defense in concluding that the MySpace post would have failed to constitute a "clear admission" by Vidal of his culpability, the record provides ample support for the court's conclusion that such a defense would not have been successful in raising a reasonable doubt as to the petitioner's culpability in this case.

[5] We may properly review the petitioner's argument that the testimony of Cox and Griffin could be considered newly discovered evidence because it is derived from the petitioner's actual innocence claim. See *Michael T.* v. *Commissioner of Correction*, 319 Conn. 623, 635 n.7, 126 A.3d 558 (2015) ("[w]e may . . . review legal arguments that differ from those raised before the trial court if they are subsumed within or intertwined with arguments related to the legal claim raised at trial" [internal quotation marks omitted]); see also *State* v. *Fernando A.*, 294 Conn. 1, 31 n.26, 981 A.2d 427 (2009) ("[although we are mindful that] the plaintiff did not [previously] raise . . . all of the theories that he raises in his writ . . . those theories are related to a single legal claim, and . . . there is substantial overlap between these theories under the case law" [internal quotation marks omitted]); *Rowe* v. *Superior Court*, 289 Conn. 649, 663, 960 A.2d 256 (2008) (same).

In the present case, the petitioner's argument regarding the testimony of Cox and Griffin is subsumed within his actual innocence claim raised before the habeas court. As such, we may review this argument.