******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

NINO D. NEALY *v.* COMMISSIONER OF CORRECTION
(AC 47267)

Suarez, Clark and Westbrook, Js.

*Syllabus*

The petitioner, who previously had been convicted, on a plea of guilty, of assault in the first degree, appealed following the denial of his petition for certification to appeal from the habeas court's judgment denying his habeas petition. He claimed, inter alia, that the court erred in concluding that his criminal trial counsel did not provide ineffective assistance because she failed to adequately investigate certain potential witnesses. *Held*:

This court dismissed the appeal because it concluded that the habeas court did not abuse its discretion in denying the petition for certification to appeal, as the petitioner failed to demonstrate, in accordance with the test adopted in *Simms* v. *Warden* (230 Conn. 608), that the issue of whether his trial counsel's representation was reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law was an issue that was debatable among jurists of reason, that a court could resolve in a different manner or that was adequate to deserve encouragement to proceed further.

Argued April 23—officially released October 21, 2025

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Newson, J.*; judgment denying the petition; thereafter, the court, *Newson, J.*, denied the petition for certification to appeal, and the petitioner appealed to this court. *Appeal dismissed*.

*Matthew C. Eagan*, assigned counsel, for the appellant (petitioner).

*Christopher A. Alexy*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, *Kelly Masi*, senior assistant state's attorney, and *Angela Macchiarulo*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

WESTBROOK, J. The petitioner, Nino D. Nealy, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the habeas court (1) abused its discretion by denying the petitioner's petition for certification to appeal the habeas court's decision and (2) improperly denied his petition for a writ of habeas corpus alleging ineffective assistance of criminal trial counsel. We conclude that the court did not abuse its discretion in denying the petition for certification to appeal and, accordingly, dismiss the petitioner's appeal.

The following facts, as set forth by the habeas court, and procedural history are relevant to the resolution of this appeal. On July 23, 2018, at approximately 7:04 a.m., the police were dispatched to the petitioner's residence to respond to a disturbance complaint. Upon arrival, they were met by the petitioner's girlfriend, Holly Foster. Foster told the police that the victim[1] showed "up at the residence banging on the door." Foster stated that, when she opened the door, the victim entered the residence "screaming and yelling," grabbed a set of car keys from the kitchen table, and left.

After Foster gave her statement to the police, the officers began traveling in the direction of the victim's residence. While en route, they learned that the victim

---

[1] In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

had contacted emergency services to address a head wound she sustained from a BB gun. When the officers arrived, they observed a laceration on the top of the victim's head, "several minor puncture wounds on her chest and stomach area, and a scrape on her right arm."

The victim told the police that she was awoken around 6 a.m. by the petitioner, who had entered her residence uninvited. The petitioner directed the victim into another room, where the two began arguing. The petitioner punched her in the face, and she struck him back. The petitioner then brandished a black crowbar and began jabbing her in the stomach with it while saying, " 'I will continue to break in anytime I want.' " At the time, the petitioner was the subject of a full no contact protective order in favor of the victim.

The victim stated that, as she attempted to leave the room, the petitioner grabbed her cell phone out of her pants pocket and ran out of her residence. The victim, using her house phone, called the police. She then called her cell phone and reported that the petitioner answered the phone and said, " 'If you call the [police] on me one more time I'm going to slice your throat.' "

At this point, the victim borrowed a friend's car and proceeded to drive to the petitioner's residence. The petitioner opened the door when she knocked, and they immediately began to argue about the return of the victim's cell phone. The petitioner began to walk toward his bedroom, while still in possession of her phone. She followed him into the room where she noticed Foster apparently asleep in bed. According to the victim, Foster awoke, and the two began to argue with each other when, suddenly, the victim was struck in the head with a hard object. When she turned around, she saw the petitioner standing behind her with a black BB gun. The petitioner began to flee the apartment, and the victim followed him. Once outside, the petitioner began

throwing rocks at her and shot her again with the BB gun, striking her in the chest multiple times.

After the victim gave her statement, the police returned to the petitioner's residence in an attempt to locate him. Upon arrival at his residence, they conducted a search that resulted in the discovery of a black BB gun behind the living room sofa. Shortly following this search, the petitioner was found hiding in a rear stairway of his residence and was arrested. During a subsequent search of the victim's residence, the police discovered a black crowbar located under a rug outside of her apartment door. They also found that the front windows were unlocked.

While incarcerated, but prior to his conviction, on February 27, 2019, the petitioner received a letter from his trial counsel, TaShun Bowden-Lewis, explaining the terms of a proposed plea agreement. In it, Bowden-Lewis stated: "Your offer is to plead to [a]ssault in the [f]irst [d]egree (felony, [twenty] year max jail, [five] year mandatory minimum) and [a]dmit your [p]robation [v]iolation ([three] years jail exposure). . . . If you accept your offer you will receive [eight] years to serve with [ten] years special parole." Bowden-Lewis also stated in the February 27, 2019 letter that "[t]he alleged victim in these cases . . . spoke to my investigator as well as the prosecutor . . . . She sticks to her story about what happened in these cases as well as admits to being aggressive and standing up for herself with you. . . . We have spoken to Kendria [Stenson], the [m]other of . . . one of your minor children as well as [Foster], your current girlfriend."

On March 27, 2019, the petitioner appeared before the trial court, *Hon. Roland D. Fasano*, judge trial referee, for a plea hearing. At the start of the hearing, the petitioner addressed the court regarding a letter he

submitted to the court expressing a desire to fire Bow-den-Lewis as his attorney. The petitioner stated on the record: "I was just expressing my remorse and sincerity in the situation and hoping that you would lessen the charge. Because right now I'm being charged with assault first, and I don't believe it was an assault first, I believe it was an assault second." At this point, Bowden-Lewis and the petitioner asked the court for a moment of time to discuss whether the petitioner would accept the state's offer. Bowden-Lewis explained her discussion with the petitioner and stated: "[The petitioner] asked if the offer was going to change. . . . And I said no, it was not, so we passed and we talked, and he's prepared to go forward with the offer today. . . . And both of these pleas, Judge, will be an *Alford*[2] plea." (Footnote added.)

Prior to accepting the petitioner's plea, the court asked him: "Are you satisfied with [Bowden-Lewis'] advice and counsel? That doesn't mean thrilled with the sentence, but satisfied she did her job," to which the petitioner responded, "Yes." The court further asked: "[Are] you . . . satisfied based on the evidence the state claims to have, that if you went to trial on all the charges, you would probably be found guilty on some or all of the charges, and you want to accept the agreement rather than risk a heavier penalty after trials and hearings; is that accurate?" The petitioner again responded, "Yes." On the advice of counsel and in accordance with the plea agreement proposed by the state, the petitioner entered a guilty plea under the *Alford* doctrine to one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (3). The petitioner also admitted to a violation of probation pending under another docket number in exchange for a recommended total effective sentence of eight years to serve, followed by

[2] *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

ten years of special parole. The court imposed the sentences in accordance with the plea agreement on May 31, 2019.

The petitioner commenced this habeas action on November 12, 2019. His amended petition, filed on August 24, 2022, alleges that Bowden-Lewis provided ineffective assistance by, inter alia, failing to conduct an adequate investigation and that, but for counsel's deficient performance, he would not have entered a guilty plea and would have proceeded to trial.[3] The respondent, the Commissioner of Correction, filed a return on August 30, 2022, which generally left the petitioner to his proof with respect to the substantive allegations in the petition. The case was then tried to the habeas court, *Newson, J.*, on August 24, 2023.

During the habeas trial, the petitioner's counsel called four witnesses and submitted several exhibits that were admitted into evidence, including the February 27, 2019 letter. The first witness was Bowden-Lewis. She testified about her discussions with the petitioner regarding his acceptance of the plea agreement. Regarding her development of a defense, she stated that her strategy was to prove "that he didn't do it." She believed that the state would call as a witness "obviously [the victim], and I'm assuming [Foster] would be one . . . too." She testified that she did not think it was likely that the

---

[3] Specifically, the petitioner alleged that Bowden-Lewis provided ineffective assistance by (a) "[f]ailing to adequately investigate or sufficiently interview" Foster, Stenson and/or the victim, (b) "[f]ailing to develop a defense utilizing the testimony of" Foster, Stenson and/or the victim, and/or (c) "[f]ailing to call as a defense witness" Foster, Stenson and/or the victim. He further alleged that, "[b]ut for trial counsel's deficient performance, there is a reasonable probability that the petitioner would not have [pleaded] guilty and would have insisted upon a trial." The petitioner's counsel later expressly abandoned the petitioner's claim in his petition of ineffective assistance on the basis of Bowden-Lewis' failure to investigate the victim, stating at the habeas trial that, as to the victim, "[w]e're not having her testify and we're not pursuing claims related to her."

state would call Stenson because "she just came to the scene after everything happened . . . ." Specifically, Bowden-Lewis testified that she spoke with Stenson and determined that Stenson would not be helpful. Bowden-Lewis further testified that she investigated whether the victim may have fabricated her story. Bowden-Lewis testified that her investigator spoke to the victim and reported that her story was the same as the one she previously gave to the police. Bowden-Lewis also testified that "[the petitioner] knew everything that we did. All the investigation. We also spoke to [the victim's sister] . . . . He knew all the people we spoke to, he knew the results of all the conversations, he had seen all the materials, so he was informed about everything." Lastly, she testified about the February 27, 2019 letter she gave to the petitioner and described it as "just one more way to make sure that he was informed about the pros and cons of either accepting or rejecting the offer."

The petitioner's counsel next called Stenson as a witness. Stenson and the petitioner share a child together but were not in a relationship at the time of the incident. She testified that Foster called her "between 6 [and] 7 [a.m.]," telling her to "get [her] child because [the victim] had broke into the house with a knife." She further testified that it took her roughly five minutes to get to the petitioner's residence after Foster's call. Stenson testified that, although the petitioner was present when she arrived, the victim was no longer at the residence. Specifically, she testified: "I wouldn't have seen the break-in or nothing."

The petitioner was the third witness. The petitioner testified about his impressions of the February 27, 2019 letter sent by Bowden-Lewis. He stated: "I felt like [Bowden-Lewis] already talked to [Foster] and [Stenson], and they weren't willing to help, basically." The petitioner also testified, "I wasn't going to go to trial if she

already talked to them and, from what I interpreted, they weren't going to be helpful." The petitioner testified that he believed Foster would testify that he was with her for the entire night. Lastly, he testified that he admitted to the trial court that he believed the allegations supported a charge of assault in the second degree, as opposed to assault in the first degree.

The last witness called was Foster. She testified that she knew who the victim was and that the victim had broken into the petitioner's residence. Foster stated: "She ransacked the house, came into the bedroom, held me at knifepoint. . . . And then [the petitioner] got her out of the house." She testified that the victim held her up against the wall while the petitioner told her to get out of the house. Additionally, she testified that, when Stenson arrived, the petitioner had already left his residence, as had the victim. She also testified that she received two phone calls after the incident regarding the case. One of the callers was from the office of the petitioner's habeas counsel, but she could not recall the other. Finally, she testified that she was never contacted prior to the petitioner's sentencing.

During closing arguments, the petitioner's habeas counsel argued that "there's a credibility contest between the [victim] and the petitioner, and that credibility contest must consider what happened afterwards as well, in terms of what [the victim] alleged happened during the initial assault." His counsel further argued that Foster and Stenson can testify to "the credibility of the [the victim]" and that this is pertinent because "she's the state's evidence as to what happened in that first incident."

The habeas court issued its memorandum of decision on November 20, 2023, and found that the petitioner failed to prove ineffective assistance of counsel on the basis of Bowden-Lewis' alleged failure to adequately

investigate Stenson and Foster. Regarding Stenson, the court found her testimony to be "wholly irrelevant" and incapable of supporting a defense. The court stated that, "[b]y the time Stenson got to the scene . . . the dispute between the victim and petitioner was over, and the victim and petitioner were both gone." The court further found that Foster's testimony lacked credibility. The habeas court noted that, although she testified about her interaction with the victim, Foster never testified regarding how the victim sustained her injuries, nor did she testify that there was any physical contact between the victim and the petitioner. The habeas court found "Bowden-Lewis credible that she spoke to . . . Foster and did not find any of the information [she] provided at that time would have been helpful to the petitioner's defense . . . ."

Regarding the petitioner, the court noted that, although he pleaded for leniency on his assault charge, absent from his plea was any intimation that he was not present at the victim's residence. Additionally, after reviewing the petitioner's letter to the trial court, the habeas court concluded that the petitioner's letter constituted an admission to assaulting the victim. The habeas court contrasted the petitioner's version of events with Foster's testimony to illustrate her lack of credibility. The court noted that the petitioner met with his trial counsel multiple times and had at least one month to consider the consequences of accepting the *Alford* plea.

Additionally, the "court found . . . Bowden-Lewis credible that she spoke to both Stenson and Foster and did not find any of the information they provided at that time would have been helpful to the petitioner's defense . . . ."

The habeas court concluded by finding there was "no credible evidence the petitioner was ever prepared, in

this matter, to proceed to trial." The court additionally found that there was no credible evidence to suggest that defense counsel failed to "conduct a diligent investigation or that she did not contact the available witnesses in the case." For these reasons, the habeas court found that the petitioner "failed to meet his burden [of] proving deficient performance or prejudice . . . ."

The petitioner filed a petition for certification to appeal the denial of his petition for a writ of habeas corpus. The habeas court denied the petition for certification to appeal. This appeal followed.

We begin by setting forth applicable principles of law and our standard of review. "Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, he [or she] must demonstrate that the denial of his [or her] petition for certification constituted an abuse of discretion. . . . To prove an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . . Second, if the petitioner can show an abuse of discretion, he [or she] must then prove that the decision of the habeas court should be reversed on the merits. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling . . . [and] [r]eversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . .

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous." (Citation omitted; internal quotation marks omitted.) *McClain* v. *Commissioner of Correction*, 188 Conn. App. 70, 74–75, 204 A.3d 82, cert. denied, 331 Conn. 914, 204 A.3d 702 (2019). "In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria  . . . adopted by this court for determining the propriety of the habeas court's denial of the petition for certification." (Internal quotation marks omitted.) *Wright* v. *Commissioner of Correction*, 201 Conn. App. 339, 345, 242 A.3d 756 (2020), cert. denied, 336 Conn. 905, 242 A.3d 1009 (2021).

The standard of review of a habeas court's judgment on an ineffective assistance of counsel claim is well settled. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary.  . . .

"In *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction  . . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense.  . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction  . . . resulted from a breakdown in the

adversary process that renders the result unreliable. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he [or she] fails to meet either prong." (Internal quotation marks omitted.) *Anderson* v. *Commissioner of Correction*, 201 Conn. App. 1, 11–12, 242 A.3d 107, cert. denied, 335 Conn. 983, 242 A.3d 105 (2020).

To prove deficient performance, the petitioner must prove that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to him] by the [s]ixth [a]mendment." *Strickland* v. *Washington*, supra, 466 U.S. 687. The petitioner is tasked with "demonstrat[ing] that his [or her] attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Internal quotation marks omitted.) *Anderson* v. *Commissioner of Correction*, supra, 201 Conn. App. 12. Additionally, "[a] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) Id.

In the context of a guilty plea, the *Strickland* test requires the petitioner to prove that counsel's conduct falls outside of the range of reasonable professional assistance and to show that, "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill* v. *Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985). "For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the

evidence would have led counsel to change his [or her] recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial." Id.

With respect to determinations of witness credibility, "[t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . Appellate courts do not second-guess the trier of fact with respect to credibility." (Citation omitted; internal quotation marks omitted.) *Necaise* v. *Commissioner of Correction*, 112 Conn. App. 817, 825–26, 964 A.2d 562, cert. denied, 292 Conn. 911, 973 A.2d 660 (2009). With these principles in mind, we turn to the merits of the petitioner's claims.

The petitioner claims that the habeas court abused its discretion by denying his petition for certification to appeal. There are two aspects to the petitioner's claim. First, he argues that Bowden-Lewis failed to adequately investigate Foster, Stenson, and the victim. Second, he argues that Bowden-Lewis failed to formulate a defense using information that she would have obtained had she investigated the witnesses mentioned previously. For the following reasons, we are not persuaded that the petitioner demonstrated that the issue of whether Bowden-Lewis' performance amounted to ineffective assistance of counsel was "debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." (Emphasis omitted; internal quotation marks omitted.) *Simms* v. *Warden*, supra, 230 Conn. 616; see *Anderson* v. *Commissioner of Correction*, supra, 201 Conn. App. 11.

This court previously found that "[t]he issue of credibility is not debatable among jurists of reason and, thus,

cannot be used to overturn the decision of a habeas court." (Internal quotation marks omitted.) *Perez* v. *Commissioner of Correction*, 194 Conn. App. 239, 243, 220 A.3d 901, cert. denied, 334 Conn. 910, 221 A.3d 43 (2019). Specifically, "[t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . Appellate courts do not second-guess the trier of fact with respect to credibility." (Internal quotation marks omitted.) Id., 242.

The petitioner's claim closely mirrors credibility issues raised in *Perez*. In *Perez*, the petitioner claimed that he was coerced into a guilty plea. Id., 241. Prior to his trial, the petitioner ultimately pleaded guilty. Id. Only four witnesses testified in the habeas trial: the petitioner, his grandmother, and his two trial attorneys. Id. The habeas court found that the only testimony supporting his claim came from the petitioner himself and his grandmother. Id. Prior to his guilty plea, the petitioner's grandmother and his cousin were arrested for witness tampering in the petitioner's case. Id. The petitioner and his grandmother subsequently met with his attorneys where he claimed his attorneys threatened him, saying "that [the petitioner's grandmother] and the petitioner's cousin would go to prison if he did not plead guilty." Id. The habeas court heard from the two trial attorneys, who stated that the petitioner had already decided to plead guilty prior to their meeting. Id. Additionally, they stated that the petitioner informed them that he wanted his grandmother present so he could consult her about whether to accept the plea and that they simply accommodated that request. Id. The habeas court found only the attorneys' testimony credible and denied the petitioner's petition and his petition for certification to appeal, which led to this court's review of the decision. Id., 242. We held that, due to

the deference afforded to the habeas court in its determinations of a witness' credibility, the petitioner had failed to meet his burden, and we dismissed the appeal. Id., 243.

In the present case, the habeas court, as the sole arbiter of witness credibility, found Bowden-Lewis' testimony credible. Bowden-Lewis investigated all key witnesses and considered whether their testimony would aid the petitioner's defense. In her February 27, 2019 letter to the petitioner, Bowden-Lewis informed the petitioner of the actions she had taken with respect to her investigation of key witnesses. In the letter, she explained the details of the proposed plea agreement and the actions she took to investigate each potential witness. From this letter, it is reasonable to conclude, as the habeas court did, that Bowden-Lewis investigated and considered the possibility of each individual's participation as a potential witness should the petitioner proceed with a trial. Ultimately, it was her reasoned opinion that the petitioner should accept the plea agreement. As previously stated, the burden falls on the petitioner to overcome the presumption that the challenged action was not sound trial strategy. See *Anderson* v. *Commissioner of Correction*, supra, 201 Conn. App. 12.

By contrast, the habeas court found that neither Foster's nor the petitioner's testimony was credible. Foster's testimony at the habeas trial conflicted with the testimony of other witnesses. Foster testified that she never spoke with Bowden-Lewis; however, in her letter to the petitioner, Bowden-Lewis stated that she had spoken with Foster. The habeas court, as the trier of fact, was not required to credit Foster. Next, Foster's recollection of events conflicts with the victim's statement to the police. Foster stated that she let the victim into the residence after the victim showed up for some

unknown reason and began banging on the door.[4] The victim, however, stated that the petitioner let her into the residence.[5] Once inside, Foster alleged that the victim held her at knifepoint, before she ransacked the residence and left with Foster's purse and keys.[6] The victim explicitly told the police that she was assaulted while at the petitioner's residence.[7] Yet, Foster's testimony did not address how the victim's injuries occurred.

Lastly, Foster testified that the petitioner was asleep the entire night. The petitioner's own statements, however, are in direct conflict with her testimony. At his plea hearing, the petitioner stated, "right now I'm being charged with assault first, and I don't believe it was an assault first, I believe it was an assault second." The court found that the petitioner's statements are effectively an admission to having committed an assault. Notably, nowhere in his statement does he say that he was not present at the victim's residence or that he was asleep with Foster, further casting doubt on the credibility of both Foster and the petitioner.

The petitioner next argues that Bowden-Lewis should have investigated Stenson to aid the creation of a defense. We agree with the habeas court's conclusion that Stenson's testimony was "wholly irrelevant" to the

---

[4] "[Foster] stated that a female she knows . . . came to her residence, and was banging hard on her apartment door. When she opened her door [the victim] walked into her apartment screaming and yelling . . . ."

[5] "When [the victim] knocked on the door [the petitioner] opened the door, and [they] began to argue when she asked him for her phone."

[6] "When [Foster] opened her door [the victim] walked into her apartment screaming and yelling but [Foster] did not [understand] what she was saying because [Foster] was half [asleep]. During the incident [the victim] grabbed her car keys from the dining room table and left the area in an unknown vehicle."

[7] The police incident report notes, "Upon arrival [at the victim's residence] I located [the victim] and I observed that she had a laceration on the top of her head a few minor puncture wounds on her chest and stomach, and a minor scrape on the right arm."

petitioner's underlying claim. Through her testimony, Stenson was able to corroborate only the fact that Foster called her "between 6 [and] 7 [a.m.]" on the day of the incident. Although Stenson arrived at the petitioner's residence shortly after the call, neither the petitioner nor the victim was present. Stenson's testimony could not help establish an alibi or any other defense for the petitioner and, therefore, lacked any exculpatory value to the petitioner had he elected to go to trial.

In short, the petitioner failed to show how Bowden-Lewis' representation was "not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Internal quotation marks omitted.) *Anderson* v. *Commissioner of Correction*, supra, 201 Conn. App. 12. Stenson's testimony was irrelevant, and Foster's inconsistent testimony was found not credible. Bowden-Lewis' choice to build a defense without those witnesses' testimony reflects a wholly reasonable belief that their testimony would have had little value at trial. Because the petitioner has failed to demonstrate that the issues raised in his habeas petition are debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the questions are adequate to deserve encouragement to proceed further, the petitioner failed to prove that the habeas court abused its discretion in denying his petition for certification to appeal.

The appeal is dismissed.

In this opinion the other judges concurred.