******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# ANTONIO INGLIS *v.* COMMISSIONER OF CORRECTION
## (AC 44492)

Prescott, Moll and Bishop, Js.

*Syllabus*

The petitioner, who had been convicted of several crimes, including murder, as a result of a shooting in a nightclub, sought a writ of habeas corpus. He claimed that his trial counsel rendered ineffective assistance as to the petitioner's third-party culpability defense and the admission into evidence of eyewitness identifications of the petitioner. The petitioner further claimed that his right to due process under the state constitution (article first, §§ 8 and 9) was violated because the eyewitness identifications of him were obtained through unnecessarily suggestive identification procedures. The petitioner had claimed that he could not properly be identified as the shooter because the witnesses could not distinguish between him and his brother, W, who was present at the time of the shooting. The trial court declined the petitioner's request to instruct the jury on third-party culpability, reasoning that the evidence failed to establish a direct connection between W and the crimes at issue. The petitioner claimed that his trial counsel were ineffective for having filed a request to charge that did not adequately refer to the evidence in support of the charge, which, in turn, resulted in the court's declining to give the jury a third-party culpability instruction. The habeas court rendered judgment denying the petition and, thereafter, denied the petitioner certification to appeal, and the petitioner appealed to this court. *Held*:

1. The habeas court did not abuse its discretion in denying the petitioner certification to appeal with respect to his claims that his trial counsel were ineffective in litigating his third-party culpability defense and issues relating to the admission at trial of the eyewitness identifications of him:

a. The habeas court properly determined that the petitioner was not prejudiced by his trial counsel's failure to cite certain evidence in their request for a jury instruction on third-party culpability, the petitioner having failed to demonstrate that there was a reasonable probability that the outcome of his trial would have been different had counsel included references to that evidence in the request to charge, as this court previously determined in the petitioner's direct appeal from his conviction that the trial court did not improperly decline to instruct the jury on the proposed charge because the evidence raised merely a bare suspicion as to a third party, which was insufficient to establish the required direct connection to that third party so as to warrant a charge on third-party culpability; moreover, contrary to the petitioner's claim that his trial counsel rendered ineffective assistance in failing to present the testimony of certain eyewitnesses in support of the petitioner's identification defense, the petitioner failed to rebut the presumption that counsel declined to call those witnesses on the basis of reasonable professional judgment, the habeas court having credited counsel's testimony that they had engaged in a risk analysis concerning whether to call the witnesses, one of whom may have given contradictory statements to the police, and the other of whom, in a written statement to the police, had identified the petitioner as the shooter, and it was not for this court to second-guess the decision of trial counsel when counsel were aware of the substance of the witnesses' anticipated testimony and made the reasonable decision not to present it due to its potentially harmful nature.

b. The petitioner failed to show a reasonable probability that counsel would have been successful in seeking to offer the testimony of an eyewitness identification expert, as any such effort would likely have been fruitless in light of our Supreme Court's case law at the time of the petitioner's criminal trial, which made clear that such testimony generally was disfavored and that it would not have been an abuse of a trial court's discretion to refuse to allow it; accordingly, the petitioner could not demonstrate that his trial counsel rendered ineffective assistance by declining to pursue a motion for expenses to retain and, ulti-

mately, not to call, an eyewitness identification expert; moreover, the procedures the police employed concerning the photographic array of suspects that they showed to the witnesses were within the acceptable parameters of effective and fair police work and satisfied the requirements of due process, as the petitioner failed to present credible evidence that those procedures were so flawed as to present a very substantial likelihood of irreparable misidentification; furthermore, the petitioner failed to establish that his trial counsel performed deficiently by not presenting evidence that an eyewitness to the shooting had chosen a photograph other than that of the petitioner from the array of photographs prepared by the police, as counsel's choice not to call that witness was not outside the wide range of reasonable professional assistance, the witness was only 50 percent sure of his choice from the array, he was not emphatic in his knowledge of the shooter's identity and, thus, could have testified that the petitioner was the shooter, thereby hurting the petitioner's defense, the witness' statement to the police tended to undermine the petitioner's third-party culpability defense and, even if counsel had performed deficiently by failing to question the witness, the jury's guilty verdict was supported by substantial other evidence concerning the petitioner's identity as the shooter.

2. The petitioner failed to establish cause and prejudice to overcome his procedural default in having failed to claim at his criminal trial and on direct appeal that the admission into evidence of the eyewitness identifications of him as the shooter violated his right to due process under article first, §§ 8 and 9; contrary to the petitioner's contention that good cause existed for that failure because established law at that time would have made his argument futile, the habeas court properly determined that he had a reasonable basis at that time to claim that the identification procedures at issue were unnecessarily suggestive and, thus, that he did not establish good cause and prejudice because our Supreme Court's case law at that time explicitly invited continued challenges to identification procedures.

Argued January 31—officially released June 28, 2022

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Chaplin, J.*; judgment denying the petition; thereafter, the court denied the petition for certification to appeal and issued an articulation of its decision, and the petitioner appealed to this court. *Appeal dismissed.*

*Vishal K. Garg*, assigned counsel, for the appellant (petitioner).

*Nancy L. Chupak*, senior assistant state's attorney, with whom, on the brief, were *Michael A. Gailor*, state's attorney, *Tamara A. Grosso*, former senior assistant state's attorney, and *Samantha L. Oden*, former deputy assistant state's attorney, for the appellee (respondent).

*Opinion*

BISHOP, J. The petitioner, Antonio Inglis, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his third amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the habeas court abused its discretion in denying his petition for certification to appeal and improperly rejected his claims that (1) his trial counsel rendered ineffective assistance in his underlying criminal trial, and (2) his right to due process under the Connecticut constitution was violated by the admission of both out-of-court and in-court eyewitness identifications of him that were obtained through unnecessarily suggestive identification procedures. We conclude that the court did not abuse its discretion in denying the petition for certification to appeal and, accordingly, dismiss the petitioner's appeal.

The following facts and procedural history are relevant to our resolution of this appeal. After a jury trial, the petitioner was convicted of two counts of murder in violation of General Statutes § 53a-54a (a), one count of capital felony murder in violation of General Statutes (Rev. to 2007) § 53a-54b (7), one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (5), and one count of carrying a pistol without a permit in violation of General Statutes § 29-35 (a). The petitioner received a total effective sentence of life imprisonment without the possibility of release, plus twenty-five years.

This court's opinion in the petitioner's direct appeal; see *State* v. *Inglis*, 151 Conn. App. 283, 94 A.3d 1204, cert. denied, 314 Conn. 920, 100 A.3d 851 (2014), cert. denied, 575 U.S. 918, 135 S. Ct. 1559, 191 L. Ed. 2d 647 (2015); sets forth the following facts: "[I]n the early hours of February 10, 2008, an altercation ensued at the Cocktails on the Green nightclub (club) in Cromwell that left two men dead and another wounded. The altercation began when the [petitioner] repeatedly antagonized one of the victims, Tyrese Lockhart, a patron seated at the bar with friends. Lockhart and his friends eventually confronted the [petitioner] and asked him to leave Lockhart alone. A group of the [petitioner's] friends that included his brother, Daren Walls, likewise encouraged the [petitioner] to leave Lockhart alone. When Israel Dandrade, a disc jockey who was performing at the club that evening, announced 'last call' soon thereafter, Lockhart headed toward an exit with friends. At that moment, the [petitioner] brandished a chrome revolver and fired several shots in Lockhart's direction. One shot struck Lockhart in the head, another struck Dandrade in the eye, and a third grazed the cheek of Kenneth Lewis, a cook at the club. Lockhart and Dandrade died as a result of their respective gunshot wounds.

"The [petitioner] subsequently was arrested and charged with the aforementioned offenses. A jury trial followed,[1] at which the state presented eyewitness testimony from multiple individuals identifying the [petitioner] as the shooter. The theory advanced by the defense was that, due to the facial similarit[ies] between Walls and the [petitioner], those witnesses could not distinguish between the two brothers to properly identify the shooter." (Footnote added; footnote omitted.) Id., 286–87.

On May 27, 2015, the petitioner filed a petition for a writ of habeas corpus. Subsequently, on September 24, 2018, the petitioner filed the operative, third amended petition for a writ of habeas corpus. In the amended petition, the petitioner set forth numerous claims, including that (1) his constitutional right to the effective assistance of counsel was violated, (2) his constitutional right to the effective assistance of appellate counsel was violated, and (3) his constitutional right to due process and a fair trial was violated.

On November 6, 2018, pursuant to Practice Book § 23-30,[2] the respondent, the Commissioner of Correction, filed a return, asserting, inter alia, that the petitioner was procedurally defaulted with respect to his due process claims because he had failed to raise them at his criminal trial or on direct appeal, and that he could not establish good cause or prejudice sufficient to excuse his failure to assert those claims on direct appeal. On December 6, 2018, pursuant to Practice Book § 23-31,[3] the petitioner filed a reply to the return in which he contended that his state due process claim was not procedurally defaulted because any attempt to raise that claim at trial would have been futile given that "the Connecticut Supreme Court [in *State* v. *Harris*, 330 Conn. 91, 191 A.3d 119 (2018)] has only recently recognized that the Connecticut . . . constitution affords greater protection than the federal constitutional standard against the admission of unreliable eyewitness identification evidence or testimony." In the alternative, the petitioner contended that, if the claim is procedurally defaulted, it can be cured by a showing of cause and prejudice because there is a reasonable probability that he would have raised this claim but for the deficient performance of trial counsel and, had the claim been raised, there is a reasonable probability that he would have prevailed.

After trial, the court denied the petition for a writ of habeas corpus. The petitioner thereafter filed a petition for certification to appeal from the court's judgment, which the court denied. The petitioner moved the court for an articulation as to the basis for the court's denial of his petition for certification, which the court granted, stating that "the petition for certification was denied on the merits." This appeal followed. Additional facts and procedural history will be set forth as necessary.

"Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, he must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . To prove an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . . Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on the merits. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling . . . [and] [r]eversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *McClain* v. *Commissioner of Correction*, 188 Conn. App. 70, 74–75, 204 A.3d 82, cert. denied, 331 Conn. 914, 204 A.3d 702 (2019).

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria . . . adopted by [our Supreme Court] for determining the propriety of the habeas court's denial of the petition for certification." (Internal quotation marks omitted.) *Whistnant* v. *Commissioner of Correction*, 199 Conn. App. 406, 415, 236 A.3d 276, cert. denied, 335 Conn. 969, 240 A.3d 286 (2020).

For the reasons set forth in parts I and II of this opinion, we conclude that the petitioner has failed to demonstrate that the habeas court abused its discretion in denying his petition for certification to appeal.

I

The record reflects that in the underlying criminal trial the petitioner was represented by Attorney Walter Bansley III and Attorney Walter C. Bansley IV.[4] In support of his claim that the habeas court abused its discretion in denying his petition for certification to appeal with respect to its decision regarding the petitioner's claim that his trial counsel rendered ineffective assistance, the petitioner asserts that his trial counsel were

ineffective in two ways: (1) by failing to litigate adequately a third-party culpability defense, and (2) by failing to litigate effectively issues relating to the admission of eyewitness identifications at trial. We discuss these claims in turn.

We begin by setting forth the standard of review and principles of law applicable to ineffective assistance of counsel claims. "To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong." (Citation omitted; internal quotation marks omitted.) *Jordan* v. *Commissioner of Correction*, 197 Conn. App. 822, 830, 234 A.3d 78 (2020), aff'd, 341 Conn. 279, 267 A.3d 120 (2021).

Finally, to the extent that the petitioner generally does not challenge the habeas court's factual findings, "each of his claims raises either questions of law or mixed questions of law and fact, over which we exercise plenary review." *Gaskin* v. *Commissioner of Correction*, 183 Conn. App. 496, 509, 193 A.3d 625 (2018).

A

The petitioner first claims that his trial counsel were ineffective in failing to litigate adequately a third-party culpability defense. Specifically, the petitioner asserts that his trial counsel (1) filed a request to charge the jury that did not adequately refer to the evidence that supported the charge, which, in turn, resulted in the court's denial of a third-party culpability instruction, and (2) failed to present two eyewitnesses in support of the defense. We are not persuaded.

1

First, the petitioner contends that the request to charge filed by his counsel with respect to the third-party culpability defense failed to comply with the requirements of Practice Book § 42-18.[5] He argues that the request to charge did not include a reference to the evidence to which the third-party culpability instruction would apply. Specifically, he contends that, "[a]t a minimum, reasonably competent counsel would have listed the three main pieces of evidence supporting the third-party culpability defense: the fact that eyewitness iden-

tifications described the shooter as having cornrows, a hooded sweatshirt, and a baseball cap." The petitioner contends that this failure resulted in the court's denial of a request for a third-party culpability charge to which he otherwise would have been entitled.

The following additional facts are relevant to our resolution of this claim. At the petitioner's criminal trial, trial counsel sought to introduce evidence that another individual—Walls—was the shooter. On direct appeal, this court summarized the evidence concerning the petitioner's third-party culpability claim at the criminal trial as follows: "Walls was the [petitioner's] brother and bore a strong facial resemblance to him. He did not [otherwise] physically resemble the [petitioner]. Unlike the [petitioner], who stood five feet, seven inches tall with a 'husky' and 'more muscular' build, Walls was five feet, ten inches tall and had a 'slim' physique. At the time of the shooting, Walls' hair was braided in cornrows, whereas the [petitioner's] hair was short and curly. The two also were dressed differently at that time. The [petitioner] wore a black knit cap, a baggy grey jacket with yellow trim, jeans, and tan boots. By contrast, Walls had on a fitted and light-colored jacket with a large emblem on the upper left chest, jeans, and no cap.

"Lockhart was seated at the bar when the [petitioner] began antagonizing him. After several minutes, Lockhart turned around and said, 'I don't even know who you are, who are you, leave me alone . . . what is the problem?' As Lockhart turned back to the bar to finish his drink, Walls intervened and attempted to calm the [petitioner]. Walls told the [petitioner] to 'let it go' and made a 'calm down' gesture with his hands. The [petitioner] nevertheless refused to 'let it go' and remained agitated. Walls continued his efforts to calm the [petitioner], telling him to 'chill, just let it go, back up . . . .' Lockhart was fatally shot soon thereafter." (Footnote in original; footnote omitted.) *State* v. *Inglis*, supra, 151 Conn. App. 290–91.

On October 9, 2009, trial counsel submitted a request to charge to the court. With respect to the third-party culpability defense, the proposed charge stated: "You have heard evidence in this case from several witnesses that someone other than [the petitioner] committed these crimes. This type of evidence is known as third-party guilt. As I have already made clear to you, the state has the burden of proving the [petitioner's] guilt beyond a reasonable doubt. . . . The question presented by third-party culpability evidence is not whether the guilt of another person has been proven, but whether, after a full consideration of all of the evidence in this case, there is a reasonable doubt that [the petitioner] was the perpetrator. Evidence that a third party may have committed this crime may, if credited, tend to raise a reasonable doubt as to whether the

state has met its required burden to prove the identity of the [petitioner] as the perpetrator. If, after considering all of the evidence, you have a reasonable doubt as to the [petitioner's] guilt, you must find the [petitioner] not guilty. See generally *State* v. *Echols*, 203 Conn. 385 [524 A.2d 1143] (1987)." On October 14, 2009, at a charging conference, the court denied the petitioner's request to charge on third-party culpability.

At the habeas trial, Bansley IV conceded that the request to charge did not contain any recitation of evidence in support of the petitioner's third-party culpability claim. In its memorandum of decision, the habeas court, *Chaplin, J.*, determined that the petitioner failed to prove that he was prejudiced by counsel's failure to include any recitation of evidence in the proposed request to charge on third-party culpability. The habeas court stated: "At the underlying criminal trial, [Bansley IV] argued the third-party culpability request to charge to the court, *Clifford, J.* Thereafter, the [trial] court addressed [Bansley IV's] argument by indicating that [it] disagreed with [his] view of the applicability of the third-party culpability charge to the evidence that had been presented to the jury. Specifically, the court noted a lack of corroborating evidence that Walls had motive and opportunity to commit the shootings. The court opined that the third-party culpability jury charge was not appropriate based on the . . . evidence before the jury, but that [it] was 'giving a more extensive charge on identification of the person who actually caused the death of the two individual[s] here.' In denying the . . . request to charge, the court reiterated, 'I don't really see it as a classic third-party culpability, and I think the instructions are adequate.' . . .

"Even if [trial counsel] had included supporting evidence in the request to charge, the evidence included would have been the same evidence that the court considered in denying the third-party culpability request to charge. Based on the court's rationale for denying the request to charge, this court finds that the inclusion of the proffered evidence in the request to charge would not have resulted in the trial court granting the . . . request to charge. For that reason, the court finds that the petitioner was not prejudiced by the . . . failure [of his trial counsel] to include evidence in the written third-party culpability request to charge."

Our analysis of the prejudice prong of *Strickland* necessarily requires a determination of whether reference to specific evidence in the request for a third-party culpability charge would have resulted in the trial court's granting of the request and whether such a charge would have resulted in a different verdict.

Upon our thorough review of the record, we find no disagreement with the habeas court's conclusion that the petitioner failed to demonstrate that there was a reasonable probability that, but for the failure of his

trial counsel to include references to specific pieces of evidence in the request to charge, the outcome of his trial would have been different. We note, as well, that the evidence that the petitioner contends should have been included in the request to charge—the eyewitnesses' descriptions of the shooter as having cornrows and wearing a hooded sweatshirt and a baseball cap— nevertheless was considered by the trial court and found to be insufficient to support a charge on third-party culpability. The trial court declined to charge the jury on third-party culpability on the basis of all of the evidence presented at trial, not because of any perceived insufficient reference to such evidence in the proposed charge itself.

Indeed, this court, in the petitioner's direct appeal, previously determined that the trial court did not abuse its discretion in failing to submit a third-party culpability instruction to the jury on the basis of its determination that the evidence before the jury failed to establish a direct connection between Walls and the criminal offense. Specifically, in his direct appeal, the petitioner argued that his request for a third-party culpability instruction was appropriate in light of the evidence that "Walls and the [petitioner] look alike, Walls was present when the shooting occurred . . . Walls had a motive to shoot Lockhart . . . and . . . at least one witness testified that the shooter's hair was braided in cornrows." (Internal quotation marks omitted.) *State* v. *Inglis*, supra, 151 Conn. App. 294. We disagreed and stated: "The mere fact that Walls bore a facial resemblance to the [petitioner] and was present at the club does not establish 'a direct connection between the third party and the charged offense, rather than merely raising a bare suspicion that another could have committed the crime, [such that] a trial court has a duty to submit an appropriate charge to the jury'; *State* v. *Arroyo*, [284 Conn. 597, 610, 935 A.2d 975 (2007)]; particularly when the jury heard ample testimony that Walls attempted to calm the [petitioner] and to diffuse the situation immediately prior to the shooting. Accordingly, we cannot say that the court improperly declined to instruct the jury on the proposed charge when the evidentiary basis proffered by the [petitioner] plainly did not meet that standard." *State* v. *Inglis*, supra, 295. Similarly, in the present case, even if trial counsel had identified all of this evidence in the request to charge on third-party culpability, it would not have resulted in such an instruction being given, nor would it have changed the outcome of the petitioner's criminal trial.

Accordingly, the habeas court properly concluded that the petitioner failed to demonstrate that there was a reasonable probability that, but for the failure of his trial counsel to include references to specific pieces of evidence in the request to charge, the outcome of his trial would have been different. Given the trial court's determination that there was insufficient evidence pre-

sented to the jury to establish a direct connection to a third party to warrant a charge on third-party culpability, the habeas court properly determined that the failure of trial counsel to cite evidence in the request to charge on third-party culpability did not prejudice the petitioner. As this court noted in the petitioner's direct appeal, the cumulative evidence presented to the jury raised a mere bare suspicion regarding a third party. In light of the foregoing, we conclude that the petitioner has failed to demonstrate that the habeas court abused its discretion in denying his petition for certification to appeal as to this issue.

2

In furtherance of his ineffective assistance of counsel claim related to a third-party culpability defense, the petitioner also contends that his trial counsel failed to introduce into evidence the testimony of two eyewitnesses who had provided descriptions of the shooter to the police, which he argues were consistent with his theory that Walls was the shooter. Specifically, the petitioner asserts that "Lisa Siena and Andre Henton both provided [the] police with signed and sworn statements that described Walls, not [the petitioner], as the shooter."

The following additional facts are relevant to our resolution of this claim. Both Siena and Henton were present at the time of the shooting and subsequently provided the police with written statements describing the shooter. Henton described the shooter as a Hispanic male, about five feet, three inches or five feet, four inches tall, 145 pounds, with curly brown hair, wearing jeans, a dark colored coat, and a baseball cap that might have been yellow and blue. Henton was close enough to the shooting such that he had blood spatter on his shirt. Siena identified the petitioner as the shooter in her written statement. She stated: "I . . . saw that [the petitioner] was holding a gun. I only saw the top half of [the petitioner]. I would say that I was less than five feet away from [the petitioner]. I then saw [the petitioner] fire a shot. . . . I heard a total of three or four shots. . . . When I saw [the petitioner] on the night of the shooting, he was wearing a black long sleeve sweater and jeans. The sweater was not casual, but more dressy. [The petitioner] has a medium to light complexion, about [five feet, eight inches to five feet, nine inches] tall, and has a thin build. [The petitioner] had his hair in [cornrows] and he did not have a hat on."

With respect to the present claim, the habeas court found that the petitioner's trial counsel did not render deficient performance. The court based its decision on the habeas testimony of the petitioner's trial counsel that they had "made a strategic decision as to each witness and whether to present such testimony, which included the testimony of Siena and Henton." The habeas court found the testimony of trial counsel to be

credible. Bansley IV testified that both he and Bansley III were "intimately aware of the issues and witnesses at the time of trial, much more so than at the time of their testimony for this matter." Bansley III testified that, "if I think they're gonna hurt the case, I don't call them as a witness. . . . [Y]ou have to make decisions in the courtroom pretty frequently as to who you present, how you present 'em, and what information you want to bring. And then you have to do a risk analysis of whether or not . . . they [are going to] help you more than hurt ya." In addition, Bansley III testified that he thought Henton had given contradictory statements to the police and to a private investigator hired by trial counsel.[6]

When asked whether Siena would have been a favorable witness, Bansley IV testified at the habeas trial that, "at the time, I knew this case inside and out. I knew all these witnesses. I knew all these statements, all these reports. . . . Even the notes you showed me shows that we looked at . . . Siena and knew the positives, the pros and cons of it. It'd be speculation to say why she was or was not called." When asked for a possible reason why he did not call her, Bansley IV answered, "[m]aybe we couldn't have found her. Maybe we did find her and talk to her and she was adamant it was [the petitioner]. We didn't need the jury hearing that." The habeas court found that the testimony of trial counsel did not support the petitioner's claim that they performed deficiently by failing to call either Siena or Henton to testify at the petitioner's criminal trial.

In resolving this claim we are guided by the principles elucidated by our Supreme Court. "[T]he decision whether to call a particular witness falls into the realm of trial strategy, which is typically left to the discretion of trial counsel . . . ." (Internal quotation marks omitted.) *Meletrich* v. *Commissioner of Correction*, 332 Conn. 615, 628, 212 A.3d 678 (2019).

"Regarding ineffectiveness claims relating to the failure to call witnesses, [w]hen faced with the question of whether counsel performed deficiently by failing to call a certain witness, the question is whether this omission was objectively reasonable because there was a strategic reason not to offer such . . . testimony . . . [and] whether reasonable counsel could have concluded that the benefit of presenting [the witness' testimony] . . . was outweighed by any damaging effect it might have. . . . Moreover, our habeas corpus jurisprudence reveals several scenarios in which courts will not second-guess defense counsel's decision not to investigate or call certain witnesses . . . such as when . . . counsel learns the substance of the witness' testimony and determines that calling that witness is unnecessary or potentially harmful to the case . . . ." (Citation omitted; internal quotation marks omitted.) *Jordan* v. *Commissioner of Correction*, 341 Conn. 279, 304, 267

A.3d 120 (2021).

Indeed, the present case is unlike *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 683, 51 A.3d 948 (2012), in which trial counsel failed entirely to contact or investigate a potentially advantageous witness. In *Gaines*, trial counsel's complete lack of investigation resulted in his total ignorance of the substance of the potential witness' testimony. Id. Our Supreme Court explained, "[t]herefore, [trial counsel's] failure to investigate and call [the potential witnesses] was not based on a reasonable professional judgment that their testimony would be either irrelevant or harmful to his case. Indeed, [trial counsel] acknowledged that, had he known the substance of their testimony, he would have called them to testify at trial . . . ." Id.

In the present case, neither Bansley III nor Bansley IV could recall the specific reason for not calling these witnesses at the criminal trial. Nevertheless, the habeas court specifically credited their testimony that they had investigated the witnesses present at the time of the shooting and were intimately familiar with the case at the time of the criminal trial.[7] Thus, because the habeas court determined that trial counsel testified credibly, that they had thoroughly investigated the potential witnesses at the time of the criminal trial, and that they engaged in a risk analysis concerning whether to call each witness at the time of trial, it concluded that the petitioner failed to overcome the presumption that the decision of trial counsel to refrain from calling Siena or Henton was based on their reasonable professional judgment. See, e.g., *Franko* v. *Commissioner of Correction*, 165 Conn. App. 505, 512, 139 A.3d 798 (2016) ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Internal quotation marks omitted.)); see also *Meletrich* v. *Commissioner of Correction*, supra, 332 Conn. 628 ("decision whether to call a particular witness falls into the realm of trial strategy, which is typically left to the discretion of trial counsel" (internal quotation marks omitted)); *Williams* v. *Commissioner of Correction*, 177 Conn. App. 321, 333, 175 A.3d 565 ("[T]ime inevitably fogs the memory of busy attorneys. That inevitability does not reverse the *Strickland* presumption of effective performance. Without evidence establishing that counsel's strategy arose from the vagaries of ignorance, inattention or ineptitude . . . *Strickland*'s strong presumption must stand." (Internal quotation marks omitted.)), cert. denied, 327 Conn. 990, 175 A.3d 563 (2017).

With respect to the two witnesses in question, Siena and Henton, we conclude that the habeas court properly determined that the petitioner failed to present evidence sufficient to rebut the presumption that his trial counsel declined to call these witnesses on the basis of strategic reasons. Specifically, the habeas court credited the testimony of trial counsel that they undertook a risk analysis in considering whether to call Siena and Henton, whose testimony tended to undermine the petitioner's identification defense. Siena's statement explicitly identified the petitioner as the shooter. Notably, Henton's statement identified the shooter as having "curly brown hair," not cornrows, which was the main physical characterization on which the petitioner relied in arguing that Walls was the shooter. Furthermore, Bansley IV testified that he thought Henton might have given inconsistent statements. See footnote 6 of this opinion. We note, as well, that the habeas court found that both trial counsel testified credibly at the habeas trial that they were intimately familiar with the case at the time of trial, including all potential witnesses. It is not for this court to second-guess the decision of trial counsel not to call certain witnesses when trial counsel were aware of the substance of their anticipated testimony and made the reasonable decision not to present it due to its potentially harmful nature. See, e.g., *Meletrich* v. *Commissioner of Correction*, supra, 332 Conn. 636–37; *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 681–82. In short, we find no fault in the habeas court's determination that it was sound trial strategy for trial counsel not to call two witnesses who identified the petitioner as the shooter.

B

The petitioner next claims that his trial counsel rendered ineffective assistance by failing to litigate issues concerning the state's introduction into evidence of unnecessarily suggestive eyewitness identifications. Specifically, he contends that trial counsel (1) failed to retain an eyewitness identification expert, (2) failed to file a motion to suppress the eyewitness identifications because the procedures used were unduly suggestive, and (3) failed to present evidence that Henton chose an individual other than the petitioner from a photographic array, which he contends would have undermined the reliability of the eyewitness identifications that were offered at trial.

1

First, the petitioner contends that trial counsel should have retained an eyewitness identification expert. Specifically, the petitioner asserts that "expert testimony would have been useful during both a suppression hearing and at the actual criminal trial" and that, "[h]ad the jury been informed about the ways in which [the] eyewitness identifications in this case were unreliable,

it would have acquitted [the petitioner].''

The following additional facts are relevant to our resolution of this claim. Six months prior to the commencement of the petitioner's criminal trial, trial counsel filed a motion for payment of necessary expenses, requesting that the court provide funds for the purpose of retaining an expert to "evaluate the case for the purposes of eyewitness identification issues . . . .''[8] Trial counsel later withdrew the motion, and, as a result, a defense expert was not used at trial. At the habeas trial, neither trial counsel could specifically recall why the motion for payment for necessary expenses was not pursued.[9]

In addressing this claim, the habeas court concluded that "the petitioner failed to provide credible evidence that [trial counsel] did not have a strategic reason for withdrawing the motion for payment of necessary expenses." The court heard testimony on the issue from Attorney Brian S. Carlow, a criminal defense expert, and Margaret Kovera, an expert in forensic psychology, as well as from trial counsel. Carlow testified that his review of the trial materials "did not furnish . . . any reason for [trial counsel] to withdraw the motion for payment of necessary expenses." The court noted, however, that although Carlow reviewed the trial materials, he did not speak with anyone involved with the case at the time. Kovera opined concerning eyewitness reliability factors and various shortcomings as to what had been presented at the petitioner's criminal trial. As to these expert witnesses, the habeas court held that "the weight of expert opinions of [Kovera] and [Carlow] does not allow this court to substitute their opinion[s] of perceived deficiencies with the actual rationale or lack of rationale that existed for [trial counsel] in 2009.''

"[F]ailing to retain or utilize an expert witness is not deficient when part of a legitimate and reasonable defense strategy." *Grover* v. *Commissioner of Correction*, 183 Conn. App. 804, 821, 194 A.3d 316 (holding that counsel was not ineffective in failing to retain or to request funding to retain expert witness), cert. denied, 330 Conn. 933, 194 A.3d 1196 (2018); see also *Nicholson* v. *Commissioner of Correction*, 186 Conn. App. 398, 414, 199 A.3d 573 (2018) ("[t]he selection of an expert witness is a paradigmatic example of the type of strategic choic[e] that, when made after thorough investigation of [the] law and facts, is virtually unchallengeable" (internal quotation marks omitted)), cert. denied, 330 Conn. 961, 199 A.3d 19, cert. denied sub nom. *Nicholson* v. *Cook*, U.S. , 140 S. Ct. 70, 205 L. Ed. 2d 76 (2019).

"[J]udicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to . . . reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

perspective at the time. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Nicholson* v. *Commissioner of Correction*, supra, 186 Conn. App. 413; see also *Meletrich* v. *Commissioner of Correction*, supra, 332 Conn. 636–37 (defense counsel's decision not to call certain witnesses was reasonable trial strategy despite inability of defense counsel to recall every detail of criminal trial or investigation concerning potential testimony of those witnesses, as defense counsel testified at habeas trial that, at time of criminal trial, he interviewed those witnesses and exercised his judgment not to call them). Moreover, our Supreme Court has recognized that "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . . [A] reviewing court is required not simply to give [the trial attorney] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [they] did . . . ." (Internal quotation marks omitted.) *Meletrich* v. *Commissioner of Correction*, supra, 637.

The habeas court concluded that the petitioner's trial counsel did not perform deficiently by failing to pursue the motion for necessary expenses in order to retain an expert. Specifically, in its memorandum of decision, the court stated: "[The trial counsel] could not recall the reason for not pursuing the motion; however, their recall of the circumstances surrounding this case demonstrates to the court that they knew the case well and they made strategic decisions appropriate to trial counsel by pursuing the motions that they believed would yield the most benefit to their client's interest. The petitioner failed to present credible evidence that [an expert witness'] testimony would have been helpful to the petitioner's case. Additionally, the petitioner failed to demonstrate that the court would have granted the motion had [trial counsel] pursued it. Thus, the petitioner presented no credible evidence to rebut the presumption that [trial counsel] acted within the bounds of reasonable professional assistance. Therefore, the petitioner's claim must fail."

We find no fault with the determination by the habeas court that the petitioner failed to demonstrate that his trial counsel rendered deficient performance in this regard. Even if we assume, arguendo, that trial counsel performed deficiently in failing to retain an eyewitness identification expert, the habeas court found, and we agree, that the petitioner was not prejudiced[10] given that the law at the time of his criminal trial was not clear as to whether trial counsel would have been able to present such testimony and whether that testimony

would have been helpful to the petitioner's case.[11] In the present case, Bansley IV testified that his best recollection was that Connecticut law did not permit the use of eyewitness identification experts at the time of the petitioner's trial and that it was a "cutting edge issue . . . ." See footnote 9 of this opinion.

At the time of the petitioner's criminal trial, *State* v. *Kemp*, 199 Conn. 473, 477, 507 A.2d 1387 (1986), overruled in part by *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012), and *State* v. *McClendon*, 248 Conn. 572, 586, 730 A.2d 1107 (1999), overruled in part by *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012), controlled the issue of expert evidence concerning eyewitness identifications. In *McClendon*, our Supreme Court reaffirmed its earlier decision in *Kemp*, holding that expert testimony on the reliability of eyewitness identifications "is within the knowledge of jurors and expert testimony generally would not assist them in determining the question. . . . [It] is also disfavored because . . . it invades the province of the jury to determine what weight or effect it wishes to give eyewitness testimony." (Internal quotation marks omitted.) Id. Although *Kemp* and *McClendon* do not prohibit a trial court from admitting expert testimony concerning the reliability of eyewitness identifications, they make clear that, at the time of the petitioner's criminal trial, such testimony generally was disfavored, and it would not have been an abuse of the trial court's discretion to refuse to allow it.

One year after the petitioner's criminal trial, our Supreme Court again held that a trial court properly excluded the testimony of an eyewitness identification expert. In *State* v. *Outing*, 298 Conn. 34, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011), our Supreme Court addressed a trial court's preclusion of testimony from an eyewitness identification expert, Jennifer Dysart, the same expert whom trial counsel in the present case sought to retain. "In *Outing*, the defendant . . . maintained that he was entitled to present expert testimony on the issue of eyewitness identifications in connection with his motions to suppress the identification testimony of two eyewitnesses. . . . The trial court declined to consider some of the proffered expert testimony and denied [the defendant's] motions to suppress. . . . Following his conviction, [the defendant] appealed to this court, claiming, inter alia, that the trial court improperly had precluded him from presenting the expert testimony at the suppression hearing. . . . In rejecting his claim, the majority in *Outing* acknowledged that it was keenly aware of the concerns [arising from] the evolving jurisprudence regarding the admissibility of expert testimony on the reliability of eyewitness identifications . . . but concluded . . . that it was both unnecessary and unwise to address his contention that [our Supreme] [C]ourt should overrule [*State* v. *Kemp*,

supra, 199 Conn. 477] and [*State* v. *McClendon*, supra, 248 Conn. 586].” (Citations omitted; internal quotation marks omitted.) *State* v. *Guilbert*, 306 Conn. 218, 225 n.4, 49 A.3d 705 (2012). It was not until 2012, three years after the petitioner’s criminal trial, that our Supreme Court decided to abandon *Kemp* and *McClendon* and embrace the notion that “[t]he reliability of eyewitness identifications frequently is not a matter within the knowledge of an average juror and . . . the admission of expert testimony on the issue does not invade the province of the jury to determine what weight to give the evidence.” Id., 251–52; see also *Velasco* v. *Commissioner of Correction*, 119 Conn. App. 164, 172–73, 987 A.2d 1031, cert. denied, 297 Conn. 901, 994 A.2d 1289 (2010). Given the governing decisional law at the time of the petitioner’s criminal trial, the petitioner has not shown that there is a reasonable probability that his trial counsel would have been successful in seeking to offer into evidence the testimony of an eyewitness identification expert.

Accordingly, the record and the status of the law at the time support the habeas court’s conclusion that the petitioner failed to establish that he was prejudiced by the decision of his trial counsel not to pursue the motion for necessary expenses for the purpose of retaining an eyewitness identification expert witness and, ultimately, not to call an expert witness at trial because any such effort by counsel would likely have been fruitless.

2

The petitioner next contends that trial counsel should have filed a motion to suppress the pretrial and in-court eyewitness identifications made by Qualnisha Lowe and Nestor Diaz because the procedures used to solicit those identifications were unnecessarily suggestive. Specifically, the petitioner contends that, “[h]ad [trial] counsel filed and pursued a motion to suppress, there is a reasonable probability that the eyewitness identifications made by . . . Diaz and . . . Lowe would have been suppressed, and [the petitioner] would have been acquitted.”

The following additional facts are relevant to our resolution of this claim. At the habeas trial, Officer William Kogut testified that, on the night of the shooting, shortly after 1:30 a.m., he met with Lowe, who provided a description of the shooter and indicated that she would be able to identify him. At that time, an officer stopped cars on the road leading to the club and asked the individuals in those vehicles to step out. Lowe was placed in a car and was driven past these individuals, but she did not identify any of them as the shooter. The petitioner was not among those individuals. At about 3 a.m., another officer took a written statement from Lowe, who stated that the shooter was “young, late teens, about [five foot, three inches]. The next morning, at about 10:45 a.m., an officer went to Lowe’s residence

to present her with a photographic array. Lowe identified the petitioner as the person whom she saw "take the gun out of his waistband." (Internal quotation marks omitted.) Lowe also identified the petitioner as the shooter at the criminal trial.

Likewise, Diaz also was presented with the same photographic array at about 2 p.m. the day after the shooting. He did not identify anyone pictured. On October 7, 2009, an inspector who worked at the Office of the State's Attorney in Middletown met with Diaz and showed him an enlarged version of the surveillance video from the shooting. Diaz pointed out the person he believed to look like the petitioner. Later that same day, Diaz testified during the petitioner's criminal trial that he witnessed the shooting. He identified the petitioner in court, during the petitioner's criminal trial, as bearing a "strong resemblance" to the person he saw in the bar who had fired the gun and said he was "confident" that the petitioner was the shooter.

At the habeas trial, trial counsel testified that they had considered filing a motion to suppress but that ultimately they did not do so. Neither could recall the specific reason for not filing the motion, but, rather, they speculated that there could have been many reasons not to and stated that, to the best of their recollection, they did not think it would be a successful motion.[12]

In its memorandum of decision, the habeas court concluded: "Having considered the totality of the circumstances, the court finds that the credible evidence presented by the petitioner demonstrates that the photographic array was not administered under pristine conditions. However, pristine conditions are not the legal standard for determining whether the administration of a photographic array was unnecessarily suggestive. *State* v. *Marquez*, [291 Conn. 122, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009)]. To that end, the court finds that the petitioner failed to present credible evidence to demonstrate that the photographic array eyewitness identification procedures used in this case were so flawed as to present a very substantial likelihood of irreparable misidentification of the petitioner. . . . Accordingly, the court cannot find that the petitioner was prejudiced by the . . . failure [of his trial counsel] to file and litigate the motion to suppress the out-of-court identifications of the petitioner by Lowe and Diaz." (Internal quotation marks omitted.)

In making this determination, the court considered the testimony presented at the habeas trial, including the testimony of the police officers who had administered the photographic arrays, and the opinions of Kovera and Carlow, concerning the suggestibility of the arrays.

Captain Richard Davis of the Middletown Police

Department testified that, in preparing the array, he included "filler" photographs of men who looked similar to the petitioner, the photographs were randomly placed within the array, and the petitioner's photograph was neither the first nor the last in the sequence. Chief Denise LaMontagne of the Cromwell Police Department testified that she followed generally accepted guidelines when administering the array to Lowe. She testified that, at the time she administered the array to Lowe, she was aware that the petitioner was a suspect but did not recall making any statements to Lowe other than providing the printed instructions.

Kovera testified concerning her expertise in the area of the psychology of eyewitness identification evidence and memory. She testified that the array in the present case deviated from pristine conditions in several ways, including that it was not double blind, the petitioner stood out from the other images included in the array because he was closest to the frame, one of the individuals in the filler photographs had a darker skin complexion than the petitioner, other fillers did not fit the suspect's description, and the petitioner's photograph was placed at the interior top of the array.

Finally, Carlow testified that, on the basis of his review of the criminal trial materials and the then-recent decision of *State* v. *Marquez*, supra, 291 Conn. 122, the petitioner's trial counsel should have filed a motion to suppress. He testified that trial counsel should have presented the testimony of any witness who had chosen a photograph of someone other than the petitioner from the array in order to challenge the eyewitness identification. He also testified that, apart from observing their files and the trial transcript, he was not familiar with the basis for the decision of trial counsel.

In evaluating the photographic array, the habeas court considered the following factors as set forth in *State* v. *Marquez*, supra, 291 Conn. 122: "(1) the degree of likeness shared by the individuals pictured . . . (2) the number of photographs included in the array . . . (3) whether the suspect's photograph prominently was displayed or otherwise was highlighted in an impermissible manner . . . (4) whether the eyewitness had been told that the array includes a photograph of a known suspect . . . (5) whether the eyewitness had been presented with multiple arrays in which the photograph of one suspect recurred repeatedly . . . and (6) whether a second eyewitness was present during the presentation of the array." (Internal quotation marks omitted.) Id., 161.

It is a basic tenet of habeas jurisprudence that, in adjudicating an ineffective assistance of counsel claim regarding the prejudice prong of the *Strickland* test, a petitioner cannot successfully show prejudice by reason of the failure of trial counsel to pursue a motion to suppress a pretrial identification unless the petitioner

can show a reasonable probability that an attack on the reliability of the identifications would have been successful. See *Velasco* v. *Commissioner of Correction*, supra, 119 Conn. App. 170. "To prevail on a motion to suppress a pretrial identification, a defendant must prevail on a two-pronged inquiry. [F]irst, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . The defendant bears the burden of proving both that the identification procedures were unnecessarily suggestive and that the resulting identification was unreliable." (Internal quotation marks omitted.) Id., 170–71.

On the basis of our review of the record, we find no disagreement with the habeas court's conclusion that the "petitioner failed to present credible evidence to demonstrate that the photographic array eyewitness identification procedures used in this case were so flawed as to present a very substantial likelihood of irreparable misidentification of the petitioner." First, although Kovera opined that one of the filler photographs depicted an individual with a darker complexion than the petitioner, the habeas court found that the photographs in the array appeared consistent with the petitioner's description. Second, although the habeas court credited the testimony of Kovera that an array should have at least five filler photographs, it is undisputed that the array in the present case contained a total of eight photographs. Third, the court determined that the petitioner's photograph was not prominently displayed or otherwise highlighted within the array. Fourth, although Lowe was aware that the petitioner was a suspect and chose his photograph from the array, there was no evidence presented to the habeas court that LaMontagne influenced Lowe's identification of the petitioner in the array. Fifth, the array remained the same for all eyewitnesses, meaning that Lowe and Diaz were not presented with multiple arrays that contained reoccurring photographs of the petitioner. Finally, there was no evidence presented at the habeas hearing that there was another eyewitness present when Lowe and Diaz were presented with the array.

On the basis of the evidence presented at the habeas trial, we find no fault with the habeas court's determination that the "procedures employed in this case, although not ideal, were within the acceptable parameters of effective and fair police work, and satisfy the requirements of due process." (Internal quotation marks omitted.) Accordingly, the habeas court properly determined that the petitioner failed to demonstrate that he was prejudiced by the performance of his trial

counsel, and his claim must fail.

### 3

The petitioner's final contention with respect to his claim of ineffective assistance of counsel is that trial counsel failed to present favorable evidence that would have undermined the reliability of the eyewitness identifications. Specifically, the petitioner asserts that "[trial] counsel should have presented evidence about . . . Henton's photo[graphic] array to show the jury that at least one witness who was present at the time of the shooting chose a filler rather than [the petitioner]. . . . Henton's testimony would have been favorable, and counsel had no explanation for not presenting his testimony." He claims that he was prejudiced because this evidence would have had an impact on the jury's verdict.

The following additional facts are relevant to our resolution of this claim. In Henton's written statement to the police, he stated that the shooting victims were "[two to three] feet away from each other and [he] was close enough that [he] had blood spatter on [his] shirt." He was shown a photographic array from which he identified a "filler" photograph as depicting the shooter, rather than the photograph of the petitioner, and stated that he was 50 percent sure. At the petitioner's criminal trial, counsel attempted to introduce testimony through the cross-examination of LaMontagne concerning Henton's identification of a filler photograph from the photographic array but were unsuccessful because the court ruled that it was inadmissible hearsay. As previously noted in this opinion, Henton did not testify at the criminal trial, and we determined in part I A 2 of this opinion that it was not deficient performance for trial counsel to decide not to present Henton as a third-party culpability witness at the petitioner's criminal trial.

With respect to this claim, the habeas court concluded: "The petitioner failed to present credible evidence as to how the evidence of Henton choosing a filler should have been presented at trial. . . . The petitioner's argument that [trial counsel] should have presented Henton's testimony seeks to have this court substitute the petitioner's opinion with that of the . . . assessment [by trial counsel] of Henton as a potential witness contemporaneous to the underlying trial. . . . [T]his court finds that the petitioner failed to present credible evidence that Henton was available and willing to testify at the petitioner's underlying criminal trial. . . . The petitioner only presented the fact that Henton chose a filler photograph from the photographic array and that he noted a 50 percent confidence level. Thus, the court is left without an evidentiary basis for concluding that Henton's testimony would have been beneficial to the petitioner's defense. Therefore, the court finds that the petitioner failed to present sufficient credible

evidence to rebut the presumption that [his trial counsel] employed reasonable trial strategy in choosing not to present Henton's testimony."

"[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." (Internal quotation marks omitted.) *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 513, 964 A.2d 1186, cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009). "In its analysis, a reviewing court may look to the performance prong or the prejudice prong first." *Quint* v. *Commissioner of Correction*, 211 Conn. App. 27, 36, 271 A.3d 681, cert. denied, 343 Conn. 922, 271 A.3d 681 (2022).

We agree with the habeas court's conclusion. First, "[a] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." (Internal quotation marks omitted.) *Weinberg* v. *Commissioner of Correction*, 112 Conn. App. 100, 112, 962 A.2d 155, cert. denied, 291 Conn. 904, 967 A.2d 1221 (2009). As the habeas court properly determined, the petitioner did not meet his burden to show that the decision of his trial counsel not to present Henton as a witness was not sound trial strategy. Given that Henton's statement did not explicitly identify Walls and that Henton stated that he was only 50 percent sure of his choice in the photographic array and that, ultimately, because he was not emphatic in his knowledge of the shooter's identity, he could have testified at trial that the petitioner was the shooter and hurt the petitioner's defense, the failure of trial counsel to call Henton was not outside the "wide range of reasonable professional assistance . . . ." (Internal quotation marks omitted.) *Meletrich* v. *Commissioner of Correction*, supra, 332 Conn. 627. As we noted in part I A 2 of this opinion, Henton's statement identified the shooter as having "curly brown hair," not cornrows, but the presence of cornrows was the main physical characterization on which the petitioner relied in arguing that Walls was the shooter. In sum, Henton's statement tended to undermine the petitioner's third-party culpability defense that Walls was the shooter. Therefore, we agree with the habeas court's conclusion that the petitioner failed to establish that his trial counsel performed deficiently by failing to call and question Henton concerning his response to the photographic array.

Moreover, even if trial counsel were deficient in that

regard, the record supports the conclusion of the habeas court that Henton's testimony would not have changed the outcome of the petitioner's trial. The record contains substantial other evidence[13] concerning the petitioner's identity as the shooter to support the jury's guilty verdict.

Accordingly, we conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal with respect to this issue.

II

The petitioner next claims that the habeas court erred in rejecting his claim that his right to due process under article first, §§ 8 and 9, of the Connecticut constitution was violated by the admission of both out-of-court and in-court identifications, made by Lowe and Diaz, that were obtained as a result of unnecessarily suggestive identification procedures. The petitioner makes two arguments in support of this claim. First, he argues that, contrary to the holding of the habeas court, his state constitutional claim was not procedurally defaulted because he can show cause and prejudice for his failure to raise this claim at his criminal trial and on direct appeal. He contends that just months before his criminal trial in September and October, 2009, our Supreme Court in *State* v. *Marquez*, supra, 291 Conn. 122, reaffirmed the principle that our state constitution affords no greater protection than the United States constitution as to eyewitness identifications, and, therefore, any such claim raised on direct appeal would have been futile. Second, he argues that, nine years after his criminal trial, our Supreme Court in *State* v. *Harris*, supra, 330 Conn. 91, concluded for the first time that the due process guarantee of the state constitution in article first, § 8, "provides somewhat broader protection than the federal constitution with respect to the admissibility of eyewitness identification testimony . . . ."[14] He argues that *Harris* applies retroactively to his case because it is a watershed rule of criminal procedure.[15] We disagree with both assertions.

We begin by setting forth the relevant standard of review and governing law. "A party in a habeas appeal procedurally defaults on a claim when he raises issues on appeal that were not properly raised at the criminal trial or the appeal thereafter. . . . Habeas, as a collateral form of relief, is generally available to litigate constitutional issues only if a more direct route to justice has been foreclosed through no fault of the petitioner. . . . The reviewability of habeas claims not properly pursued on appeal is subject to the cause and prejudice standard." (Citation omitted; internal quotation marks omitted.) *Gaskin* v. *Commissioner of Correction*, supra, 183 Conn. App. 511.

"In order for a habeas court to decide the merits of a petitioner's procedurally defaulted claim, the petitioner

must typically demonstrate cause and prejudice for his failure to preserve that claim. . . . Under this standard, the petitioner must demonstrate good cause for his failure to raise a claim at trial or on direct appeal and actual prejudice resulting from the impropriety claimed in the habeas petition. . . .

"The cause and prejudice standard is designed to prevent full review of issues in habeas corpus proceedings that counsel did not raise at trial or on appeal for reasons of tactics, [inadvertence] or ignorance . . . . [T]he existence of cause for a procedural default must ordinarily turn on whether the [petitioner] can show that some objective factor external to the defense impeded counsel's efforts to comply with the [s]tate's procedural rule. . . . Cause and prejudice must be established conjunctively. . . . If the petitioner fails to demonstrate either one, a trial court will not review the merits of his habeas claim." (Citation omitted; internal quotation marks omitted.) *Sinchak* v. *Commissioner of Correction*, 173 Conn. App. 352, 365–66, 163 A.3d 1208, cert. denied, 327 Conn. 901, 169 A.3d 796 (2017).

For example, "a showing that the factual or legal basis for a claim was not reasonably available to counsel . . . would constitute cause under this standard." (Internal quotation marks omitted.) *Zachs* v. *Commissioner of Correction*, 205 Conn. App. 243, 273, 257 A.3d 423, cert. denied, 338 Conn. 909, 258 A.3d 1279 (2021). We exercise plenary review to determine whether the court properly determined that the petitioner's claim is procedurally defaulted. See *Saunders* v. *Commissioner of Correction*, 343 Conn. 1, 10, 272 A.3d 169 (2022).

The petitioner argues that good cause existed for the failure of his trial counsel to raise the issue at his criminal trial or on direct appeal given that the established law at the time would have made that argument futile. The petitioner relies on *Hinds* v. *Commissioner of Correction*, 151 Conn. App. 837, 97 A.3d 986 (2014), aff'd, 321 Conn. 56, 136 A.3d 596 (2016), in which this court examined the parameters of cause and prejudice within the procedural default doctrine. In *Hinds*, the petitioner failed to challenge our courts' long-standing interpretation of this state's kidnapping statutes at his criminal trial or on direct appeal but claimed that a new interpretation first set forth after his trial should be applied retroactively. After a thorough canvass of the decisional law expounding on procedural default, this court stated that, "we believe that counsel's failure to raise an issue for which there was no reasonable basis may, indeed, satisfy the cause requirement." Id., 854. Our Supreme Court, in affirming this court's decision; see *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 67–68, 136 A.3d 596 (2016); noted that it had iterated its position numerous times prior to the petitioner's criminal trial that the interpretation of the kidnapping statute adopted after the petitioner's criminal trial in that case

was foreclosed and appeared to foreclose the possibility that movement of a sexual assault victim from one room in her home to another room could constitute a situation that was "absurd and unconscionable . . . [and] that would render the statute unconstitutionally vague as applied." Id. Our Supreme Court concluded that the petitioner's claim was not procedurally defaulted, stating: "Not only was there a three decades long history preceding the petitioner's criminal trial of rejecting such a challenge, but mere months after the petitioner's trial, the court . . . again rejected such a challenge." Id., 76.

In the present case, we conclude that, unlike in *Hinds*, the petitioner had a reasonable basis to claim at his criminal trial and on direct appeal that the identification procedures at issue were unnecessarily suggestive under the Connecticut constitution. Specifically, we find unpersuasive the petitioner's argument that both *State* v. *Ledbetter*, 275 Conn. 534, 881 A.2d 290 (2005) (overruled in part by *State* v. *Harris*, 330 Conn. 91, 191 A.3d 119 (2018)), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006), and *State* v. *Marquez*, supra, 291 Conn. 122, each of which were decided prior to his criminal trial, establish the futility of his argument that the state constitution is more protective than the federal constitution.

In *State* v. *Ledbetter*, supra, 275 Conn. 560, our Supreme Court addressed a constitutional challenge to eyewitness identifications made in that case. The defendant argued, inter alia, that the court should replace the factors set forth in *Neil* v. *Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), used in determining the reliability of identifications, on state constitutional grounds. The court recognized that "in some instances, our state constitution provides protections beyond those provided by the federal constitution . . . ." *State* v. *Ledbetter*, supra, 560. Accordingly, the court undertook an analysis to determine whether the *Biggers* factors should be replaced, specifically, whether our state constitution provides greater protection than the federal constitution on this issue. After a thorough survey of each of those factors under the framework set forth in *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992),[16] the court concluded: "Despite the fact that [the] last [*Geisler*] factor [contemporary understandings of economic and sociological considerations] favors the defendant, we are unpersuaded that article first, § 8, of the constitution of Connecticut provides greater protection than the federal constitution in this area. The scientific studies are not definitive. . . . In light of the factors that weigh in favor of the state, the scientific studies are insufficient to tilt the balance of the *Geisler* analysis in favor of the defendant. Thus, our state constitution does not require that we abandon the *Biggers* factors as the appropriate factors for consideration in determining whether an unnecessarily suggestive identification procedure is,

nevertheless, reliable, and we decline to do so." (Citations omitted.) *State* v. *Ledbetter*, supra, 568–69.

In *State* v. *Marquez*, supra, 291 Conn. 122, the defendant challenged the reliability of eyewitness identifications. Our Supreme Court "reaffirm[ed] the congruence between the protections afforded by our state constitution and the federal constitution in the area of pretrial identification . . . ." Id., 135–36. The court stated: "[T]he judgment of the relevant scientific community with respect to eyewitness identification procedures is far from universal or even well established, and . . . the research is in great flux. Indeed, when the reported research was seemingly more uniform, we still found that [t]he scientific studies are not definitive. *State* v. *Ledbetter*, supra, 275 Conn. 568. The more recent research offered by the state muddies the water further . . . . [U]ntil the scientific research produces more definitive answers with respect to the effects of various procedures, [d]ue process does not require the suppression of a photographic identification that is not the product of a double-blind, sequential procedure." (Citation omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Marquez*, supra, 155–56.

Although, in the present case, the petitioner argues that the decisional law at the time of his criminal trial—namely, *Ledbetter* and *Marquez*—foreclosed the argument that he now raises, we are not persuaded that asserting a state constitutional claim in this regard would have been futile. Our reading of both *Ledbetter* and *Marquez* leaves ample room for counsel to have made arguments at the time of the petitioner's criminal trial akin to those that were later adopted in *Harris*. Specifically, in determining that our state constitution does not provide greater protection than the federal constitution, both cases relied heavily on the scientific studies available at the time but did not explicitly foreclose arguments such as the court did in *Hinds*. In fact, our jurisprudence specifically left room for new arguments to be made congruently with rapidly changing science. "Indeed, we repeatedly have insisted that this inquiry be made on an ad hoc basis, and we affirm that *the courts of this state should continue to evaluate whether individual identification procedures are unnecessarily suggestive on the basis of the totality of the circumstances surrounding the procedure* . . . ." (Emphasis added; internal quotation marks omitted.) Id., 156. Thus, rather than foreclosing the possibility of making similar arguments in the future, the court explicitly invited continued challenges to identification procedures on the basis of the circumstances of a particular case.

On this basis, we conclude that the habeas court properly determined "that the petitioner [failed to satisfy] the cause and prejudice standard so as to cure the alleged procedural default." The petitioner's due

process argument would not have been futile given the law at the time, and, thus, the petitioner has failed to establish good cause for his failure to make his constitutional arguments at his criminal trial and on direct appeal, and actual prejudice resulting from that failure.[17]

The habeas court, therefore, did not abuse its discretion in denying the petition for certification to appeal with respect to this issue.

The appeal is dismissed.

In this opinion the other judges concurred.

[1] The petitioner's criminal trial took place in September and October, 2009.

[2] Practice Book § 23-30 provides: "(a) The respondent shall file a return to the petition setting forth the facts claimed to justify the detention and attaching any commitment order upon which custody is based.

"(b) The return shall respond to the allegations of the petition and shall allege any facts in support of any claim of procedural default, abuse of the writ, or any other claim that the petitioner is not entitled to relief."

[3] Practice Book § 23-31 provides: "(a) If the return alleges any defense or claim that the petitioner is not entitled to relief, and such allegations are not put in dispute by the petition, the petitioner shall file a reply.

"(b) The reply shall admit or deny any allegations that the petitioner is not entitled to relief.

"(c) The reply shall allege any facts and assert any cause and prejudice claimed to permit review of any issue despite any claimed procedural default. The reply shall not restate the claims of the petition."

[4] We refer to both attorneys collectively as trial counsel throughout this opinion, except when necessary to distinguish between them.

[5] Practice Book § 42-18 (a) provides in relevant part: "When there are several requests, they shall be in separate and numbered paragraphs, each containing a single proposition of law clearly and concisely stated with the citation of authority upon which it is based, and the evidence to which the proposition would apply. . . ."

[6] Specifically, the petitioner's habeas counsel asked Bansley III, "I believe you stated that possibly . . . Henton had given two different statements; one to the police, and then a separate one that was maybe contradictory to your investigator. Is that correct?" He responded: "That's what I think, but I'm not sure." Further, Bansley III testified that he thought Henton's statement to the police was "totally inconsistent" with the description of Walls, particularly because his description did not mention anything about cornrows.

[7] Bansley IV testified at the habeas trial that, "[a]t the time, I knew this case inside and out. I knew all these witnesses. I knew all these statements, all these reports. I know everyone's considered."

In addition, during cross-examination, the following colloquy occurred between the petitioner's habeas counsel and Bansley IV:

"Q. . . . [C]an you tell the court what investigation you conducted to pursue your theories of defense?

"A. Generally, we always have an investigator that goes out. I cannot think of a trial that I have conducted where I did not have an investigator. So, that would've been the primary focus. . . .

"Q. . . . [W]hat did you do to research and investigate the eyewitness identification issues?

"A. I think the main thing is, going over discovery, looking at all the commonsense inconsistencies and applying that to all the theories behind why there are misidentifications. . . .

"Q. . . . And I believe you said that you knew all of the witnesses in this case, both the lay witnesses and the police officers. . . . I mean that you had investigated them, that you spoke with them.

"A. I would've at least read reports, at a minimum.

"Q. Okay. Well, I'm just . . . trying to restate that you familiarized yourself with all the witnesses.

"A. I knew this case."

In addition, Bansley III testified: "I know that we spent a lot of time and money with a private investigator . . . . He was, in my opinion, very diligent. He did a lot of work. I do recall he brought us some information that was really helpful. I just don't remember the specifics of it at the moment.

. . . [M]y son and I also went out and, you know, we like to do hands on. We went to the club and we looked at the videotape. We tried to reconstruct it. You know, so we did a lot."

[8] The trial court, *Clifford*, *J.*, on March 31, 2009, stated to trial counsel with respect to the motion for payment of necessary expenses: "[Y]ou represent the [petitioner] privately, and you're asking the Judicial Department, basically, to pay the expenses for investigators, etc. . . . I think I mentioned in chambers, I mean, part of me feels that's what the public defender system is for, and when a private attorney gets into a case, that they should be able to finance their own investigators once they file the appearance. . . . I think we're going to need a hearing." No hearing was held on the motion because trial counsel withdrew the motion two months later.

[9] At the habeas trial, the following colloquy took place between the petitioner's habeas counsel and Bansley IV:

"Q. Okay. Based on your knowledge of the case generally, can you think of a reason why that motion would have been withdrawn?

"A. I cannot.

"Q. Can you think of any strategic reason for having withdrawn the motion?

"A. I can't.

"Q. . . . And just briefly before I move on to the next topic, had you had [this eyewitness expert] testify previously at a criminal trial?

"A. I don't—my recollection is, I don't believe courts were allowing it at the time.

"Q. Okay.

"A. That's my best recollection.

"Q. Alright. But is it something you were attempting to get in, nonetheless?

"A. Yes. I remember for my first five years of practice, it was a real cutting edge issue, that we were one of the first ones that contacted [the expert] and, and really explored the issue. But I don't believe the courts were allowing it. That's my best recollection."

[10] In its memorandum of decision, the habeas court noted that "the petitioner failed to demonstrate that the [trial] court would have granted the motion had [trial counsel] pursued it." In reaching this determination, the habeas court appears to have decided that the petitioner failed to prove both prongs of the *Strickland* test for ineffective assistance of counsel. Because a habeas petition fails unless both prongs are proven, we focus in this appeal on the habeas court's determination regarding the prejudice prong.

[11] In his appellate brief, the respondent argues that the petitioner also failed to demonstrate that he was prejudiced by his counsel's allegedly deficient performance. Specifically, the respondent argues that, "even if counsel should have pursued the motion for payment of necessary expenses and offered testimony from an eyewitness identification expert, the petitioner has not demonstrated that the trial court would have permitted such testimony."

[12] At the habeas trial, the following colloquy occurred between the petitioner's habeas counsel and Bansley IV:

"Q. . . . And there was no motion to suppress identifications filed in this case. Do you know why that is?

"A. To the best of my recollection, we did not think that it would be successful.

* * *

"Q. Okay. And I believe you testified to the reasons that you did not file a motion to suppress. Were there any other reasons besides what you said earlier?

"A. I think I said that reasons why I might not have, because I don't recall the exact reason why I didn't in this case.

"Q. Okay. But those would be the type of reasons why you would decide not to?

"A. Sure, there could be many, many reasons."

[13] This court set forth that evidence as follows in the petitioner's direct appeal: "Brothers Maurice Overton and Andre Overton were at the club at all relevant times. Maurice Overton testified at trial that he saw the [petitioner] holding a gun at the time of the shooting. Andre Overton similarly testified that when the gunshots rang out, he turned and saw the [petitioner] holding a chrome gun in his hand. Andre Overton was approximately five feet behind the [petitioner] at that time. [Lowe] also identified the [petitioner] as the shooter at trial. She testified that, at the time of the shooting, she was two feet from the [petitioner] and 'looked right in his face.' [Diaz] testified that at the time of the shooting, he was approximately five feet from the person

holding the gun and was 'confident' in his identification of the [petitioner] as the shooter. Dana Middleton was socializing with Lockhart at the club and witnessed the [petitioner] antagonizing Lockhart prior to the shooting. He testified that the [petitioner] was approximately ten feet away and 'kept dancing around and pointing his fingers and . . . making gestures like he was making . . . threats, basically.' . . . Moments later as Middleton and Lockhart were leaving the bar, Middleton heard gunshots and then saw Lockhart on the ground with a hole in his head and brain matter on the floor. Middleton then saw the [petitioner] approximately five feet away holding a gun that was pointed in his direction." *State* v. *Inglis*, supra, 151 Conn. App. 286–87 n.6.

[14] The habeas court did not reach the merits of the claim regarding the retroactivity of *Harris* but, rather, disposed of this claim on procedural grounds because it determined that the petitioner had not properly raised the claim. The petitioner claims that the habeas court improperly concluded that he had conceded that a retroactivity issue was not raised in the pleadings and, accordingly, denied the claim on that ground. He argues that this was in error because, (1) to the extent that retroactivity, or its lack thereof, must be pleaded, it is the respondent's burden to raise it, (2) his pleading implied a retroactivity claim, and (3) he made clear on the first day of trial that he sought to claim that *State* v. *Harris*, supra, 330 Conn. 91, applied retroactively to his case. In response, the respondent contends that the habeas court properly declined to reach the issue of whether *Harris* applied retroactively because (1) the petitioner's habeas petition made no mention of *Harris*, and (2) his mention of *Harris* in his reply and his argument at the habeas trial were insufficient to properly plead this claim. We conclude that the petitioner's *Harris* claim properly was raised, and, accordingly, we address it on the merits.

The petitioner's reply to the respondent's return stated: "To the extent that [the third] claim [in the third amended habeas petition] is based on the petitioner's due process rights pursuant to [the] Connecticut constitution, claim three is not subject to procedural default because the Connecticut Supreme Court has only recently recognized that the Connecticut state constitution affords greater protection than the federal constitutional standard against the admission of unreliable eyewitness identification evidence or testimony. See [id., 130–31] . . . ." (Internal quotation marks omitted.) He also made the same argument as to the fourth claim in his habeas petition, which alleged a violation of his constitutional right to present a defense. His reply is in compliance with Practice Book § 23-31 (b), which provides that "[t]he reply shall admit or deny any allegations that the petitioner is not entitled to relief," and with Practice Book § 23-31 (c), which provides in relevant part that "[t]he reply shall allege any facts and assert any cause and prejudice claimed to permit review of any issue despite any claimed procedural default. . . ." In addition, on the first day of the habeas trial, counsel for the petitioner explicitly stated that "[o]ur argument is that *Harris* applies retroactively . . . . We are alleging in part that there is cause . . . to overcome the procedural default or that procedural default doesn't apply because any attempt to raise these claims at the time of the petitioner's trial would've been futile."

On the basis of the petitioner's reply, in which he explicitly cites to *Harris* and makes the argument that is now before this court, as well as the arguments of habeas counsel at the habeas trial, we conclude that the petitioner properly preserved the issue concerning the retroactivity of *State* v. *Harris*, supra, 330 Conn. 91.

[15] "[I]f the new rule is procedural, it applies retroactively if it is a watershed [rule] of criminal procedure . . . implicit in the concept of ordered liberty . . . meaning that it implicat[es] the fundamental fairness and accuracy of [a] criminal proceeding." (Citation omitted; internal quotation marks omitted.) *Casiano* v. *Commissioner of Correction*, 317 Conn. 52, 63, 115 A.3d 1031 (2015), cert. denied sub nom. *Semple* v. *Casiano*, 577 U.S. 1202, 136 S. Ct. 1364, 194 L. Ed. 2d 376 (2016).

[16] "In *State* v. *Geisler*, [supra, 222 Conn. 672, our Supreme Court] enumerated the following six factors to be considered in construing the state constitution: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies. . . . The *Geisler* analysis applies to cases . . . in which the claim is that the state constitution provides greater protection

than does the federal constitution." (Internal quotation marks omitted.) *State* v. *Jose A. B.*, 342 Conn. 489, 507–508, 270 A.3d 656 (2022).

[17] Even if we assume, arguendo, that the petitioner could show cause and prejudice to overcome procedural default, we reject his second argument that *Harris*, decided nine years after the conclusion of his criminal trial, applies retroactively because it is a watershed rule of criminal procedure.

It is well settled that courts apply the rule promulgated in *Teague* v. *Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989), when considering whether a new rule of criminal procedure applies retroactively. "If the rule is substantive, it generally applies retroactively. . . . A procedural rule, on the other hand, is only retroactive if it is considered watershed." (Citation omitted; internal quotation marks omitted.) *Garcia* v. *Commissioner of Correction*, 147 Conn. App. 669, 677, 84 A.3d 1, cert. denied, 312 Conn. 905, 93 A.3d 156 (2014). "The watershed exception [to *Teague* v. *Lane*, supra, 311] is reserved for those rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding. . . . Beyond fundamental fairness, the new rule also must constitute a procedure without which the likelihood of an accurate conviction is seriously diminished." (Citation omitted; internal quotation marks omitted.) *Dyous* v. *Commissioner of Mental Health & Addiction Services*, 324 Conn. 163, 181–82, 151 A.3d 1247 (2016).

The petitioner concedes that the rule promulgated in *State* v. *Harris*, supra, 330 Conn. 91, is a new rule and that it is procedural in nature. Specifically, the petitioner argues that "*Harris* is specifically directed toward ensuring an accurate determination of a defendant's innocence or guilt and constitutes a watershed rule that applies retroactively on collateral review."

In September, 2018, our Supreme Court in *Harris* replaced the *Biggers* factors, which Connecticut courts had been employing to analyze claims concerning unnecessarily suggestive eyewitness identifications, with the *Guilbert* factors. Nevertheless, the court expressly stated that the new factors are "generally comparable to the *Biggers* factors and are merely intended to more precisely define the focus of the relevant inquiry." (Internal quotation marks omitted.) Id., 136.

This court has had recent occasion to address the issue of whether *Harris* applies retroactively. In *Tatum* v. *Commissioner of Correction*, 211 Conn. App. 42, 272 A.3d 218 (2022), petition for cert. filed (Conn. April 27, 2022) (No. 210408), this court undertook a thorough analysis concerning whether *State* v. *Guilbert*, supra, 306 Conn. 218, promulgated a watershed rule and, as such, could be applied retroactively. This court in *Tatum* held: "[O]ur Supreme Court [in *Harris*] essentially treated *Guilbert* as creating a new state constitutional rule of criminal procedure that safeguards the due process protection against the admission of an unreliable identification. Even if we were to construe *Guilbert*, through the lens of *Harris*, as a new constitutional rule of criminal procedure, this rule still would not apply on collateral review. . . . [W]e conclude that the *Guilbert* framework for evaluating the reliability of an identification that is the result of an unnecessarily suggestive identification procedure, which was adopted by our Supreme Court in *Harris*, does not fall within the narrow watershed exception pursuant to *Teague* because . . . (1) this rule is prophylactic and a violation of the rule does not necessarily rise to the level of a due process violation, and (2) the rule amounts to an incremental change in identification procedures." (Citations omitted; internal quotation marks omitted.) *Tatum* v. *Commissioner of Correction*, supra, 65–67.

Because the rule adopted in *Harris* is a mere "incremental change in identification procedures"; id., 67; and decidedly not a watershed rule, there is no basis in the present case for retroactive application.

---